**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

BRIANNA BUENTELLO,

      Plaintiff,

v.

LAUREN BOEBERT, in her official and individual capacities,

      Defendant.

---

**MOTION FOR PRELIMINARY INJUNCTION**

---

      Plaintiff Brianna Buentello ("Buentello"), by and through her attorneys David A. Lane and Andy McNulty of KILLMER, LANE & NEWMAN, LLP, hereby files this Motion for Preliminary Injunction. Buentello respectfully requests that this Court enjoin Defendant Lauren Boebert ("Boebert"), who is the United States Representative for Colorado's Third Congressional District, from blocking her on Twitter. The grounds for this motion are set forth fully herein:

1. **<u>Introduction</u>**

      If nothing else, the First Amendment "rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public." *Associated Press v. United States*, 326 U.S. 1, 20 (1945). Today, Americans' exchange of political ideas happens increasingly on social media platforms like Twitter. Courts have appreciated the democratizing potential of cyberspace ever since their earliest encounters with the medium.

Two decades ago, the Supreme Court of the United States described the Internet as "a vast platform from which to address and hear from a worldwide audience." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 853 (1997). In providing "relatively unlimited, low-cost capacity for communication of all kinds," the Internet enables virtually anyone to "become a town crier with a voice that resonates farther than it could from any soapbox." *Id.* at 870. More recently, the Court identified the Internet—and "social media in particular"—as "the most important place[] . . . for the exchange of views" in contemporary life. *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017). As an instrument for "speaking and listening in the modern public square," social media affords "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Id.* at 1737.

Twitter exemplifies the civic dynamism of social networking tools, for better or worse. Its users converse openly with one another on urgent social and political issues, inviting real-time responses from interested contributors. These discussions increasingly involve policymakers themselves, as Facebook enables Americans to "petition their elected representatives and otherwise engage with them in a direct manner." *Packingham*, 137 S. Ct. at 1735. Indeed, because of the platform's prominence, "Governors in all 50 States and almost every Member of Congress have set up accounts for this purpose." *Id.* This includes Boebert. The importance of Twitter as a forum for modern political discussion is self-evident.

Accordingly, courts "must exercise extreme caution before suggesting that the First Amendment provides scant protection for access to vast networks in that medium." *Id.* at 1736. The Supreme Court's classification of cyberspace as "the modern public square" "embraces the social norm that assumes the openness and accessibility of that forum to all comers." *hiQ Labs, Inc. v. LinkedIn Corp.*, No. 17-cv-03301-EMC, 2017 WL 3473663, at *7 (N.D. Cal. Aug. 14,

2017). Governmental restrictions on the use of social media—a "vital, developing forum"—cannot be permitted simply because "alternative channels" exist to transmit and receive information. *Davison v. Loudoun Cty. Bd. of Supervisors*, 267 F. Supp. 3d 702, 718 (E.D. Va. 2017).

Boebert, the United States Representative for Colorado's Third Congressional District, has established and maintained an official Twitter page, @laurenboebert, which is almost exclusively devoted to her views on  important political issues in Colorado and the nation. Boebert blocked Buentello from viewing her Twitter page after Buentello criticized Boebert's tweets in response to the United States Congress' intent to certify the Electoral College's results from the 2020 presidential election and informing the insurrectionists of the location of the Speaker of the House (who the mob was searching for) and the location of herself (and, consequently, other congressional representatives). Boebert's blocking of Buentello has allowed Boebert to present the (false) impression that her constituents (and all Coloradoans) support her every decision. The skewing of information, and debate, is exactly what Boebert has accomplished through silencing Buentello's viewpoint.

Allowing Boebert to silence naysayers and allow only those who share her viewpoint to view and reply to her tweets has dire consequences, in that it undermines one of the fundamental purposes of the First Amendment. Continuing to let Boebert selectively control who can view and reply to her tweets would allow "one side of a debatable public question to have a monopoly in expressing its views[.]" *See Madison Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n*, 429 U.S. 167, 175–76 (1976).

Boebert is essentially carefully curating abject lies and right-wing propaganda via social media. Over time, Boebert's approach to censoring critics may lead officials at all levels of

government to seek to cultivate a false impression that they (and their political positions) are universally adored by the public. Such practices are a familiar playbook for authoritarian regimes.[1] And they have begun to creep into the United States, as evidenced by Boebert's actions, President Trump's censorship of dissenting views on his Twitter account,[2] and the Facebook scandal involving Cambridge Analytica. This real-world exploitation of social media makes it all the more important that the First Amendment remain a bulwark against any governmental impulse to "silence dissent," "distort the marketplace of ideas," and "remove certain ideas or perspectives from a broader debate." *Matal v. Tam*, 137 S. Ct. 1744, 1766–67 (2017) (Kennedy, J., concurring in part and concurring in the judgment). Ultimately, "to cast disapproval on particular viewpoints . . . risks the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 836 (1995). Buentello asks that this Court not allow the residents of Colorado to undertake such a risk.

## 2. **Factual Background**[3]

---

[1] Seva Gunitsky, *Corrupting the Cyber-Commons: Social Media as a Tool of Autocratic Stability*, PERSPECTIVES ON POLITICS, Mar. 2015, at 42, 45 (discussing government use of social media in countries such as China, North Korea, and Russia to "reinforce regime legitimacy through careful management of online discourse," and concluding that "social media creates space for the management of public discourse that sidelines or discredits anti-regime sentiment, while at the same time mobilizing the regime's own supporters"); Arch Puddington, *Breaking Down Democracy: Goals, Strategies, and Methods of Modern Authoritarians* 19 (June 2017), Freedom House,
https://freedomhouse.org/sites/default/files/June2017_FH_Report_Breaking_Down_Democracy.pdf (reporting that China "deploys armies of paid and volunteer commentators to flood social media with progovernment remarks, influence online discussions, report or attack those who make antigovernment comments, or sow confusion about particular incidents that might reflect poorly on the leadership.").

[2] *See Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019) ("*Knight II*").

[3] Should Boebert dispute the factual assertions in this Section, Buentello asks that this Court hold an evidentiary hearing prior to ruling on this Motion. *See Detroit & T. S. L. R.R. Co. v. Bhd. of Locomotive Firemen & Enginemen*, 357 F.2d 152 (6th Cir. 1966) (noting that under Rule 65(a),

2.1 **Twitter is a platform particularly well-suited for public debate and discussion.**

Buentello is a Twitter user who has been blocked by Boebert from viewing her tweets, and replying to those tweets, from the @laurenboebert account because Buentello posted messages that were critical of Boebert. **Exhibit 1**, *Declaration of Brianna Buentello*, ¶¶ 13-19. Boebert's blocking of Buentello prevents her from replying to Boebert's tweets and from participating in the discussion that happens in the replies to Boebert's tweets. *Id.* Boebert has banished Buentello from the interactive space associated with Boebert's Twitter page.

Twitter is a social media platform with more than 187 million daily active users, in the three months prior to September 30, 2020. *See* Twitter, Inc., Quarterly Report (Form 10-Q) (September 30, 2020).[4] Twitter allows users to publish messages of up to 280 characters on any topic. *How to Use Twitter*, WIKIHOW, https://www.wikihow.com/Use-Twitter (last visited January 16, 2021). Speech on Twitter ranges from birthday wishes to satirical content to heartfelt reconnections to political discourse. Particularly relevant to this lawsuit is the amount of speech by, to, and about the government at all levels that occurs on Twitter on a daily basis.

Twitter users are those with an account that has been created on the platform. *Id.* A Twitter user's "account" includes the user's name and a description of themselves created and maintained by the user. *Id.* Twitter profiles can be protected by users, which results in limits on

---

if there is controversy over facts, a hearing should be held at which time plaintiff should be required to offer evidence in support of allegations of complaint, and defendant should be afforded opportunity to offer testimony in opposition thereto); *McDonald's Corp. v. Robertson*, 147 F.3d 1301 (11th Cir. 1998) (holding that where facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue, evidentiary hearing must be held by district court); *Rothstein v. Manuti*, 235 F. Supp. 48 (S.D.N.Y. 1964) (finding that customarily, where many factual elements are in dispute on application for preliminary injunction, hearing is necessary to resolve disputed issues).
[4] Available at: https://s22.q4cdn.com/826641620/files/doc_financials/2020/q3/cb1d93d5-13d2-4d03-96b4-c90efe5ac5fc.pdf.

who can see the user's timeline, who can search for their posts, and who can reply to their tweets. *How to Block Someone on Twitter*, WIKIHOW, https://www.wikihow.com/Block-Someone-on-Twitter (last visited January 16, 2021). This is called "blocking" a user. *Id.* Blocked users cannot participate in the interactive space of the Twitter user who has blocked them. *Id.* This prevents blocked users from participating in the reply threads. *Id.*

### 2.2 **Boebert operates @laurenboebert in her capacity as the United States Representative for Colorado's Third Congressional District and her page functions as a digital town hall for speech on political matters.**

Boebert maintains the @laurenboebert Twitter account as "Congresswoman for CO-03." Lauren Boebert (@laurenboebert), TWITTER, https://twitter.com/laurenboebert (last visited January 16, 2021); **Exhibit 1**, ¶¶ 4-10. Boebert presents her page to the public as one she operates in his official capacity rather than his personal capacity. *Id.* Boebert's page is generally accessible to the public at large without regard to political affiliation or any other limiting criteria. *Id.* Any member of the public who has not been blocked can view her posts and reply to her posts. *Id.* Any Twitter user who wants to follow Boebert's page can do so and her page has over 400,000 followers. *Id.* Boebert uses her page to promote official government business and she uses the account to directly communicate with her constituents in her official capacity. *Id.* The tweets, and reply threads, on @laurenboebert page are important forums for discussion and debate about governmental policy. *Id.* Her page functions as a digital town hall in which Boebert communicates official news and information to the public and members of the public can comment on that news and information to both respond to Boebert and exchange views with other members of the public. *Id.*

### 2.3 **Boebert blocks Buentello from @laurenboebert.**

Prior to the insurrection at the Capitol on January 6, 2021, Buentello noticed that Boebert tweeted from the @laurenboebert account "This is 1776." Buentello took this as a tweet from Boebert to those who had gathered at the Capitol that armed insurrection was appropriate. **Exhibit 1**, ¶¶ 13-22. Later, while the insurrection was ongoing, Buentello observed that Boebert tweeted from the @laurenboebert account about the location of United States Speaker of the House Nancy Pelosi (and other members of Congress). *Id.* In response to these tweets, Buentello immediately began criticizing Boebert's actions from her own Twitter account, @Bri4CO. *Id.* The afternoon of the insurrection, Buentello tweeted (tagging @laurenboebert) calling for Rep. Boebert's recall and calling her actions seditious. *Id.* Buentello continued tweeting (and retweeting) criticism of the Senators and Representatives, including Boebert, who voted against certification, and who fanned the flames of the insurrection. *Id.*

Less than twenty-four hours after Buentello's tweet tagging @laurenboebert and criticizing her, Boebert blocked Buentello from the @laurenboebert account. *Id.* As a result of Boebert's actions, Buentello can no longer view the @laurenboebert account's tweets. *Id.* She can no longer reply to the @laurenboebert tweets. *Id.* And, Buentello can no longer participate in the discussions in the replies to Boebert's tweets. *Id.* Each new tweet by Boebert is a piece of information that she is foreclosed from receiving and a potential discussion (in the replies to that tweet) that she cannot participate in. *Id.* To this day, Buentello is still blocked from the @laurenboebert account. *Id.* Boebert banned Buentello because she was critical of Boebert. Boebert has also blocked others who have been critical of her on Twitter. *Id.*; *see also* Marianne Goodland, *U.S. Rep Lauren Boebert is blocking Twitter users which could open door to lawsuits*, THE COLORADO SPRINGS GAZETTE, https://gazette.com/politics/u-s-rep-lauren-boebert-is-blocking-twitter-users-which-could-open-door-to-lawsuits/article_03fa3150-a09a-5092-bdbc-

ddb444bd7e97.html (last visited January 16, 2021) (detailing other Twitter users blocked by Boerbert).

3. **<u>Standard of Review</u>**

In considering whether to issue a preliminary injunction, this Court must analyze: (1) whether Buentello has a substantial likelihood of prevailing on the merits, (2) whether Buentello faces a threat of irreparable harm if the injunction is not granted, (3) the balance between the harm endured by Buentello absent an injunction and the injury that the injunction's issuance would inflict upon Defendant, and (4) whether the public interest is served by an injunction. *American Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1155 (10th Cir. 1999). "When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minnesota Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2011) (en banc) (internal quotation marks omitted). Accordingly, when plaintiffs are "likely to win on the merits of [their] First Amendment claim, a preliminary injunction is proper." *Id*. at 877.

4. **<u>Argument</u>**

4.1 **Buentello has a substantial likelihood of prevailing on the merits.**

4.1.1 <u>Boebert's blocking of Buentello on Twitter violates the First Amendment's free speech clause.</u>

The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech[.]" U.S. Const. amend. I; *see also Gitlow v. New York*, 268 U.S. 652, 666 (1925) (holding that the First Amendment applies to the states and municipalities through the Fourteenth Amendment's Due Process Clause). To determine whether the First Amendment's guarantee of freedom of speech has been violated, this Court must first decide whether the speech in which the plaintiff seeks to engage, and has engaged in, "is speech protected by the First Amendment."

8

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). Then, this Court must determine the putative forum's classification, *i.e.* whether it is a traditional public, designated public, limited, or nonpublic forum. *Id.* at 800. Finally, the Court must determine whether "the extent to which the Government [has] control[led] access" to the forum is consistent with the class of forum. *Id.*

Boebert has violated Buentello's First Amendment rights by blocking her on Twitter based on the viewpoint of Buentello's speech. Boebert's Twitter page, @laurenboebert, is a designated public forum for free speech that is being used as an instrument of governance and, accordingly, is subject to the First Amendment. The broad consensus of authority, where courts have repeatedly addressed this exact situation, holds that Boebert's blocking of Buentello violates the First Amendment. *See e.g., Garnier v. O'Connor-Ratcliff*, No. 3:17-cv-02215-BEN-JLB, 2021 U.S. Dist. LEXIS 7613, at *2 (S.D. Cal. Jan. 14, 2021) (holding, after two day bench trial, that school board members had violated the plaintiffs' First Amendment rights by blocking them on Twitter); *Felts v. Reed*, No. 4:20-CV-00821 JAR, 2020 U.S. Dist. LEXIS 224489 (E.D. Mo. Dec. 1, 2020) (denying motion to dismiss because plaintiff had plausibly alleged that alderman's Twitter account was a public forum, that his actions blocking plaintiff were taken under color of law, and that his actions in blocking plaintiff were not government speech); *Lewis v. Jones*, 440 F. Supp. 3d 1123, 1134 (E.D. Cal. 2020) (granting preliminary injunction and requiring that a local sheriff unblock the plaintiff from his re-election Facebook page); *Tanner v. Ziegenhorn*, No. 4:17-cv-780-DPM, 2020 U.S. Dist. LEXIS 173295, at *2 (E.D. Ark. Sep. 22, 2020) (denying summary judgment for defendant, in part, because "[t]he interactive section of this Facebook page isn't government speech but is instead a designated public forum"); *Sanchez v. Tubbs*, No. 2:19-cv-326-JAM-EFB PS, 2020 U.S. Dist. LEXIS 156114, at *2-3 (E.D. Cal.

Aug. 27, 2020) (holding that plaintiff had alleged a First Amendment violation where he alleged that a mayor blocked him on Twitter and Facebook based on his critical comments); *Phillips v. Ochoa*, No. 2:20-cv-00272-JAD-VCF, 2020 U.S. Dist. LEXIS 104068, at *5 (D. Nev. June 12, 2020) (holding that a local judge's campaign Facebook page was a public forum and that his blocking of plaintiff, and deletion of comments calling for the election of the judge's opponent, stated a First Amendment claim); *Popp v. Monroe Cty.*, No. 1:19-cv-03664-JPH-DML, 2020 U.S. Dist. LEXIS 57042, at *1 (S.D. Ind. Mar. 31, 2020) (approving declaratory judgment stating that a local sheriff's office violated the First Amendment by "hiding" plaintiff's comments on its Facebook page); *Robinson v. Hunt Cnty., Tex.*, 921 F.3d 440, 448 (5th Cir. 2019) (holding that the plaintiff sufficiently pled that the official Facebook page of the Hunt County Sheriff's Office was a public forum and deletion of comments constituted viewpoint discrimination); *Knight II*, 928 F.3d at 237 (affirming the district court's finding that the interactive comment space in President Trump's Twitter account is a public forum); *Davison v. Randall*, 912 F.3d 666, 682 (4th Cir. 2019) (holding the interactive component of a Facebook page administered by a chair of a county board of supervisors was a public forum); *Campbell v. Reisch*, 367 F. Supp. 3d 987, 992 (W.D. Mo. 2019) (denying a motion to dismiss, finding the interactive space below Twitter posts on defendant state representative's page was subject to public forum analysis and that the court did not need to classify the forum to deny the motion because the alleged viewpoint discrimination would have violated the First Amendment in any forum); *Campbell v. Reisch*, No. 2:18-cv-4129-BCW, 2019 WL 3856591, at *6–7 (W.D. Mo. Aug. 16, 2019) (concluding, in judgment after a bench trial, that the interactive space of defendant state representative's Twitter account was a designated public forum); *Windom v. Harshbarger*, 396 F. Supp. 3d 675, 683 (N.D.W. Va. 2019) (denying a motion to dismiss and

holding the plaintiff had sufficiently alleged defendant state legislator's Facebook page was a public forum where the legislator allowed public comments on the page); *One Wisconsin Now v. Kremer*, 354 F. Supp. 3d 940, 954 (W.D. Wis. 2019) (holding the interactive portions of defendant state legislators' Twitter pages were designated public forums and "[h]aving opted to create a Twitter account . . . and benefit from its broad, public reach, defendants cannot now divorce themselves from its First Amendment implications and responsibilities as state actors"); *Garnier v. Poway Unified Sch. Dist.*, No. 17-CV-2215-W (JLB), 2019 WL 4736208, at *8-9 (S.D. Cal. Sept. 26, 2019) (holding the interactive portions of social media pages of two school board members were public forums because the board members established a government presence on the pages, used the pages to communicate official business to constituents, and did not set general restrictions on access to the pages or discussion); *Leuthy v. LePage*, No. 1:17-CV-00296-JAW, 2018 WL 4134628, at *15 (D. Me. Aug. 29, 2018) (denying a motion to dismiss and holding plaintiffs stated a First Amendment claim against a governor who deleted posts and banned users from his Facebook page).

And, particularly, when considering the definitive case on this issue, it is clear that Boebert's actions were unconstitutional. *Knight II*, 928 F.3d at 226. In *Knight II* the second Circuit held, while considering whether President Trump's blocking of users on his personal Twitter account violated the First Amendment, that: (i) social media activity "is entitled to the same First Amendment protections as other forms of media," *id.* at 237; (ii) a public official's social media account, to the extent "intentionally opened for public discussion," "repeatedly used . . . as an official vehicle for governance," and "accessible to the public without limitation" is a type of public forum; and (iii) "the First Amendment does not permit a public official who utilizes a social media account for all manner of official purposes to exclude persons from an

otherwise—open online dialogue because they expressed views with which the official disagrees." *Knight*, 928 F.3d at 230.[5] Boebert's actions violate the First Amendment because they fit neatly within each factor of the test outlined in *Knight II*.

### 4.1.1.1 *Buentello's speech is protected by the First Amendment.*

Buentello wishes to engage in political speech by sharing her viewpoints on Boebert's Twitter page and has been banned from doing so. Specifically, Buentello seeks to criticize the official actions of a sitting United States Representative, which can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Snyder v. Phelps,* 131 S. Ct. 1207, 1216 (2011) (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)). Such speech "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Id.* at 1207.

There is no reasonable argument that Buentello's speech falls within the "well-defined and narrowly limited classes of speech," such as obscenity, defamation, fraud, incitement, and speech integral to criminal conduct, "the prevention and punishment of which have never been thought to raise any Constitutional problem." *See Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 791 (2011) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942)). Buentello's speech is therefore entitled to First Amendment protection. *See Knight* 302 F. Supp. 3d at 565 (holding that twitter comments on President Trump's personal Twitter page were First Amendment protected political speech).

### 4.1.1.2 *The interactive space associated with Boebert's Twitter page (wherein users can comment and reply to other users' comments) is a designated public forum.*

---

[5] The Second Circuit denied rehearing *en banc* in *Knight* and multiple other judges (outside of the panel that decided the underlying case) authored a decision in the course of that denial affirming the panel's decision. *See Knight First Amendment Inst. at Columbia Univ. v. Trump*, 953 F.3d 216 (2d Cir. 2020).

"[A] public forum may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech." *Cornelius*, 473 U.S. at 802; *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983); *Make The Road by Walking, Inc. v. Turner*, 378 F.3d 133, 142–43 (2d Cir. 2004). Boebert's Twitter page is accessible to anyone with a Twitter account without regard to political affiliation or any other limiting criteria. Boebert has not published any rule or policy purporting to restrict, by form or subject matter, the speech of those who participate in the forum. Nor has she sought to limit the forum to specific classes of speakers based on their status — *e.g.*, Boebert's family, friends, or business colleagues. Boebert has permitted anyone who wants to follow the account to do so. That Boebert has banned Buentello for her tweets is further evidence that Boebert is attentive to the general public tagging her in tweets.

Boebert purposefully opened this forum to speech by the general public and this conscious decision is evidenced by her opting to use Twitter, an inherently interactive platform. The ability to reply to tweets on Boebert's Twitter page is clearly "compatible with the intended purpose" of his page, *see Ark . Educ. Tv Comm'n v. Forbes*, 523 U.S. 666, 673 (1998), as Twitter users understand that the "principal purpose" of the site is to promote "the free exchange of ideas[,]" *see Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 679 (1992). And, even beyond what would be possible in a physical forum, Boebert's Twitter page is "capable of accommodating a large number of public speakers without defeating the essential function of . . . the program." *See Pleasant Grove City v. Summum*, 555 U.S. 460, 478 (2009). As the Supreme Court emphasized in *Packingham*, social media platforms like Twitter offer "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard," in part

because these platforms permit citizens to "engage with [their elected representatives] in a direct manner." *Packingham*, 137 S. Ct. at 1737.[6]

The overwhelming majority of cases that have addressed this specific issue, namely whether a government official's social media page is a public forum for free speech, have answered that question affirmatively. *See e.g., Am. Atheists v. Rapert*, No. 4:19-cv-00017-KGB, 2019 U.S. Dist. LEXIS 230493, at *64 (E.D. Ark. Sep. 30, 2019) (holding that plaintiff had a likelihood of success on the merits that the interactive space associated with a state senator's tweets was a public forum for free speech); *Hyman v. Kirksey*, No. 3:18-cv-230-DPM, 2019 U.S. Dist. LEXIS 90509, at *4 (E.D. Ark. May 30, 2019) (holding that the defendant police department "provided a public space for citizens to speak, and they spoke."); *One Wis.*, 2019 U.S. Dist. LEXIS 8828, at *30-32 (holding that the interactive space related to state legislators' official Twitter accounts were designated public fora); *Campbell*, 367 F. Supp. 3d at 992 (holding that "the public forum doctrine applies to [defendant's] Twitter account . . . [and] that the interactive space following each tweet in which other users may directly interact with the content of the tweets is subject to forum analysis."); *Price v. City of New York*, No. 15 Civ. 5871 (KPF), 2018 WL 3117507, at *15 (S.D.N.Y. June 25, 2018) (holding that "the City's official Twitter pages share many characteristics of public forums [. . .]": Twitter is "generally open to

---

[6] The Supreme Court's case law regarding public broadcasters also supports the conclusion that the Boebert's Twitter page is a designated public forum. Although public broadcasters generally are not subject to scrutiny under the forum doctrine, in *Forbes* the Court found candidate debates to be an exception to this rule, reasoning that a debate is "by design a forum for political speech by the candidates . . . with minimal intrusion by the broadcaster." 523 U.S. at 675. Twitter users, including Buentello, responding to Boebert's tweetss participate in discussions on important policy topics with virtually no editorial intrusion, and Twitter allows for far broader participation than a televised debate. Thus, Twitter and other interactive social media fit within the public forum rubric, not the more deferential doctrines generally applicable to traditional media. *Cf. Reno*, 521 U.S. at 868–69 (declining to treat speech on the "vast democratic forums" of the Internet similarly to broadcast media).

the public"; appears to be "designed for and dedicated to expressive activities"; and appears to have "as a principal purpose . . . the free exchange of ideas").

For example, in the definitive case on the matter, the Second Circuit held that President Donald Trump's previously personal Twitter account, @realDonaldTrump, is a designated public forum for free speech because "[t]he Account was intentionally opened for public discussion when the President, upon assuming office, repeatedly used the Account as an official vehicle for governance and made its interactive features accessible to the public without limitation." *Knight II*, 928 F.3d at 237. The Court held as much because "the Account is presented by the President and the White House staff as belonging to, and operated by, the President" and "since becoming President he has used the Account on almost a daily basis "as a channel for communicating and interacting with the public about his administration." *Id.* at 235.

The Second Circuit's decision in *Knight* affirmed the Southern District of New York, and that decision also confirms that @laurenboebert is a public forum for free speech. In *Knight I*, the S.D.N.Y. held that the "interactive space associated with a tweet" (specifically the ability to reply to a tweet, view replies, and reply to other replies) of President Trump's personal Twitter account constituted a designated public forum. *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 573-75 (S.D.N.Y. 2018) (*Knight I*). The Court started by recognizing that "governmental intent" is "the touchstone for determining whether a public forum has been created." *Id.* at 574 (quoting *Gen. Media Commc'ns, Inc. v. Cohen*, 131 F.3d 273, 279 (2d Cir. 1997)). The Court then concluded that the interactive space associated with the President's Twitter account had been intended to be open to free speech because: (1) the President's Twitter account "is generally accessible to the public at large without regard to political affiliation or any other limiting criteria"; (2) "any member of the public can view his

15

tweets"; (3) "anyone with a Twitter account who has not been blocked may participate in the interactive space by replying or retweeting the President's tweets"; "the account -- including all of its constituent components -- has been held out. . . as a means through which the President 'communicates directly with you, the American people'"; and (5) there was "no serious suggestion that the interactive space is incompatible with expressive activity[.]"

Other courts have held that purportedly personal social media profiles are designated public *fora* for free speech. *Davison*, 267 F. Supp. 3d at 716. In *Davison*, the Eastern District of Virginia recognized that, "[w]hen one creates a Facebook page, one generally opens a digital space for the exchange of ideas and information." *Id*. It also held that because the government official had "allowed virtually unfettered discussion" on her Facebook page and had solicited comments from her constituents that the official's actions qualified as a "governmental 'designation of a place or channel of communication for use by the public'" that was "more than sufficient to create a forum for speech." *Id*. (quoting Cornelius, 473 U.S. at 802); *cf. Page v. Lexington County Sch. Dist. One*, 531 F.3d 275, 284 (4th Cir. 2008) (suggesting that forum analysis would be appropriate if a government website included "a type of 'chat room' or 'bulletin board' in which private viewers could express opinions or post information"). The district court's determination in *Davison* that the government official's personal Facebook page was a designated public forum was affirmed by the Fourth Circuit. *Davison v. Randall*, 912 F.3d 666, 682 (4th Cir. 2019).

All of the considerations considered by the courts in *Knight I*, *Knight II*, and *Davison* to dispositively make the government officials' social media page a public forum for free speech also make @laurenboebert a public forum. Boebert's uses @laurenboebert ("a social media account open to the public") as "as an official account for conducting official business." *Knight*

*II*, 928 F.3d at at 236. She has opened up her page for expression and not meaningfully limited who may interact in any way (other than blocking critics). She has chosen a forum, Twitter, that is made for facilitating expressive activity. There is no question that the forum at issue here is compatible with expressive activity: the entire purpose of a Twitter page is to facilitate speech. Boebert's Twitter page is a "metaphysical space," in the language of the Supreme Court, *Rosenberger*, 515 U.S. at 830, in which Boebert speaks and members of the public respond to, and engage with one another about, those statements. *See id.* (applying public forum analysis to student newspaper funding); *Perry Educ. Ass'n*, 460 U.S. at 46–47 (school mail system); *Cornelius*, 473 U.S. at 801 (charitable contribution program). The forum thus includes speech by Boebert (as well as speech by ordinary citizens) in the same way that a town hall meeting[7] ordinarily encompasses speech by government officials as well as speech by the assembled public.

---

[7] In essence, Boebert's Twitter page functions like a digital town hall meeting—one in which Boebert stands at the front of the room and assembled citizens respond to his statements and engage with each other about those statements. The Tenth Circuit has specifically recognized that these types of meetings constitute designated public fora. *Mesa v. White*, 197 F.3d 1041, 1044-45 (10th Cir. 1999). And other courts have near unanimously agreed "that a designated public forum exists when a governmental body affords the public an opportunity to address the body at its meeting." *Piscottano v. Town of Somers*, 396 F. Supp.2d 187, 201 (D. Conn. 2005); *see, e.g.*, *White v. City of Norwalk*, 900 F.2d 1421, 1425 (9th Cir. 1990) ("City Council meetings . . . where the public is afforded the opportunity to address the Council[] are the focus of highly important individual and governmental interests . . . . [S]uch meetings, once opened, have been regarded as public forums, albeit limited ones."); *Jones v. Heyman*, 888 F.2d 1328, 1331 (11th Cir. 1989) ("[T]he city commission designated their meeting a public forum when the commission intentionally opened it to the public and permitted public discourse on agenda items."); *Surita v. Hyde*, 665 F.3d 860, 869 (7th Cir. 2011) (expressing "no doubt" that "audience time during . . . city council meetings constituted a designated public forum); *Musso v. Hourigan*, 836 F.2d 736, 742 (2d Cir. 1988) (noting that public speech is usually allowed at an open school board meeting); *Scroggins v. City of Topeka*, 2 F.Supp.2d 1362, 1370 (D. Kan. 1998) (characterizing a city council meeting as a designated public forum); *Zapach v. Dismuke*, 134 F.Supp.2d 682 (E.D. Pa. 2001) (holding that a zoning hearing board meeting was designated public forum); *Pesek v. City of Brunswick*, 794 F.Supp. 768, 782 (N.D. Ohio 1992) (holding that a city council meeting open to public was a designated public forum).

Finally, although Boebert was "not required to create the forum in the first place," she has chosen to establish @laurenboebert as a venue that is "open for use by the general public." *See Perry Educ. Ass'n*, 460 U.S. at 45, 47. Boebert has affirmatively chosen to use Twitter's speech-enhancing features. Boebert cannot avoid the strictures imposed on public *fora* merely because Twitter is not owned by the government. Boebert's use of Twitter is akin to the government renting a suitable space to hold its public meetings, rather than hosting meetings in space it owns. *See generally* Lyrissa Lidsky, *Public Forum 2.0*, 91 B.U. L. REV. 1975, 1996 (2011) ("[G]overnment ownership is not a *sine qua non* of public forum status."). Boebert is the exclusive user of @laurenboebert, and she, not Twitter, exercises effective control over the public's access to the feed and the public's ability to interact there. This makes the interactive space associated with @laurenboebert (wherein users can comment and reply to other users' comments) a designated public forum.

       4.1.1.3   *Boebert's blocking of Buentello is unconstitutional viewpoint discrimination.*

It is well established that the government is forbidden from engaging in viewpoint discrimination regardless of the forum. *Pleasant Grove*, 555 U.S. at 469-70 (viewpoint discrimination prohibited in traditional, designated, and limited public forums); *Cornelius*, 473 U.S. at 806 (viewpoint discrimination prohibited in nonpublic forums); *Mesa*, 197 F.3d at 1047 ("[V]iewpoint discrimination is almost universally condemned and rarely passes constitutional scrutiny."); *Knight II*, 928 F.3d at 237; *Davison*, 267 F. Supp. 3d at 716. "[G]overnment may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972).

Here, there can be little dispute that Boebert banned Buentello because of her viewpoint. Within twenty-four hours of her critical comments, which tagged the @laurenboebert account, Boebert blocked Buentello. Buentello had previously been able to view the @laurenboebert account. And other courts have held that viewpoint discrimination of this nature violates the First Amendment.

In *Leuthy*, the Maine District Court held that Governor Paul LePage's banning of a number of Facebook users with dissenting viewpoints from commenting on his official Facebook page based on their viewpoint stated a First Amendment claim, without deciding whether the Governor's Facebook page was a traditional, designated, limited, or nonpublic forum. 2018 U.S. Dist. LEXIS 146894, at *22-23. In holding that viewpoint discrimination by the government in banning members of the public from commenting on official Facebook pages violates the First Amendment no matter the character of the forum, the Court reasoned that the right to disseminate speech about political issues on social media is "an area highly protected by the First Amendment" and that "whether the Facebook page is a public forum, a designated public forum, or a non-public forum, viewpoint discrimination is not permissible." *Id.*

Moreover, in another analogous case, the Court in *Price* held that it was of no difference whether the interactive space relating to a government official's social media account was a public, designate, limited, or nonpublic forum, because the plaintiff had alleged viewpoint discrimination and, therefore, had alleged a First Amendment violation. 2018 U.S. Dist. LEXIS 105815, at *39. The Court denied the defendant's motion to dismiss because "[r]egardless of whether it occurs in a public, designated, or nonpublic forum, viewpoint discrimination that results in the intentional, targeted expulsion of individuals from these forums violates the Free Speech Clause of the First Amendment." *Id.* Buentello in this case has shown that she was

blocked because of her criticism. Viewpoint discrimination by the government is unconstitutional, no matter the forum.

Ultimately, allowing Boebert to continue to feign democratic engagement while squelching skeptical voices runs contrary to the Supreme Court's teachings about why viewpoint discrimination is so corrosive to democratic functioning: "the prohibition on viewpoint discrimination serves that important purpose of the Free Speech Clause, which is to bar the government from skewing public debate[.]" *See Rosenberger*, 515 U.S. at 894 (Souter, J., dissenting).[8]

### 4.1.1.4   *Boebert's blocking of Buentello is state action.*

Boebert's actions demonstrate that she was acting under color of state law in her blocking of Buentello, and operation of @laurenbebert. To determine whether conduct amounts to state action, courts consider the totality of circumstances. *Skinner v. Ry. Labor Executives' Assoc.*, 489 U.S. 602, 614-15 (1989); *Howerton v. Gabica*, 708 F.2d 380, 384 (9th Cir. 1983).There must be a "sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974). The Second and Fourth Circuits, as well as the Southern District of California, have recently addressed the issue of whether a public official's operation of a purportedly "personal" social media account has a sufficient nexus to the state. When viewing Boebert's actions in light of these decisions, it is clear that she was operating under color of law when blocking Buentello.

---

[8] Ironically, Boebert spends a great deal of Twitter energy decrying the lack of free speech in America, while at the same time censoring anyone who is remotely critical of her authoritarian ideology.  *See e.g.* https://twitter.com/laurenboebert/status/1350256227884929027?ref_src=twsrc%5Egoogle%7Ctwcamp%5Eserp%7Ctwgr%5Etweet

In *Knight II*, plaintiffs brought a § 1983 claim after President Trump blocked them from his public Twitter account because they criticized him and/or his policies. 928 F.3d at 226. The court concluded that President Trump acted in a governmental capacity, not as a private citizen, in blocking users. *Id.* at 234-236. The court noted that the Twitter account bore "all the trapping of an official state-run account" because the President used his official title on the account and posted photographs of himself engaged in official duties, such as signing executive orders and delivering remarks. *Id.* at 231. Further, the court found persuasive that the President and the White House presented the account as the President's official account. *Id.* at 235. The court also emphasized that the President used the account on "almost a daily basis as a channel for communicating with the public about his administration." *Id.* For example, President Trump used the account to announce matters of official government business, such as high-level staff changes, changes to major national policies, and engagement with foreign leaders on foreign policy decisions. *Id.* at 235-36. The court concluded that "the factors pointing to the public, non-private nature of the Account and its interactive features are overwhelming." *Id.* at 236.

In *Davison*, the Fourth Circuit affirmed a finding that the defendant, the Chair of a County Board of Supervisors, acted under color of state law in blocking plaintiff from her Facebook page. 912 F.3d at 681. The court noted that the defendant used her page to inform the public about the Board's official activities and numerous aspects of the defendant's official duties, such as notifying the public about upcoming meetings, inviting the public to participate, publicizing trips she had taken in furtherance of county business, and informing the public about significant public safety events. *Id.* at 680-81. The court also found persuasive that the defendant used her official title on the page, included her county email address, linked to the county website and contact information, and categorized the page as one for a "Government

Official." *Id.* Finally, the court emphasized that the defendant's "specific actions giving rise to plaintiff's claim are linked to events which arose out of her official status" because the defendant blocked plaintiff after he commented on a post by the defendant about at a town hall meeting. *Id.* Therefore, despite there being a "few" posts addressing topics less closely related to her official duties, the court affirmed the finding that the defendant's blocking of plaintiff was state action. *Id.* at 674, 681.

In *Garnier*, the defendants were members of a school board who created public Facebook pages to help promote their campaigns. 2019 U.S. Dist. LEXIS 167247, at *1. Plaintiffs brought a § 1983 claim after the defendants blocked them from their Facebook page. 2019 U.S. Dist. LEXIS 167247, at *2. In determining whether the defendants acted under color of state law, the court noted that defendants changed their pages to reflect their board positions after winning the elections, categorized their pages as those of a "Government Official," identified themselves by their official titles, and included the official school board email address. 2019 U.S. Dist. LEXIS 167247, at *7. The court also mentioned that defendants used their pages to provide information about their school board activities and other school board information, such as linking to an online synopsis of a school board meeting and providing notice about board meetings and subjects to be discussed. *Id.* Finally, the court stated that just as in *Davison*, defendants' posts were linked to events which arose out of their official status as school board members. *Id.* Based on the foregoing, the court found that defendants acted under color of state law because "[t]he content of [the defendants'] posts, considered in totality, went beyond their policy preferences or information about their campaigns for reelection . . . and bore a sufficiently close nexus with the state." *Id.*

Like President Trump in *Knight*, @laurenboebert bears "all the trappings" of Boebert's office. 928 F.3d at 231. Boebert uses her official title on the page and it includes pictures of her in office. She also uses the page much like the defendants in *Davison* and *Garnier*: to inform the public about developments in her office, her votes, and her decisions relating to her work as a Congressional Representative. And, like in *Davison* and *Garnier*, Buentello's claims arise from critical comments she made regarding Boebert's actions in her official capacity. Courts have held that this is sufficient to show state action. *See Lewis v. Jones*, 440 F. Supp. 3d 1123, 1132-34 (E.D. Cal. 2020); *Leuthy*, No. 1:17-cv-00296-JAW, 2018 U.S. Dist. LEXIS 146894, at *22-23 (holding that Maine Governor Paul LePage's banning of the plaintiffs from commenting on his official Facebook page constituted state action, subjecting Governor LePage's banning to the First Amendment); *Garnier*, 2018 U.S. Dist. LEXIS 87987, at *8-9 (holding that government officials were acting under color of state law when they banned plaintiffs from posting messages on their official Facebook pages); *One Wis. Now*, 2019 U.S. Dist. LEXIS 8828, at *22 (holding that state legislators' blocking individuals from commenting on, and viewing, their official Twitter accounts constituted state action).

    4.1.2   <u>Boebert's blocking of Buentello imposes an unconstitutional restriction on her First Amendment right to petition the government for redress of grievances.</u>

Boebert's blocking of Buentello also violates the First Amendment because it imposes a burden on her right "to petition the Government for a redress of grievances." U.S. Const. amend. I. "The right to petition the Government is part of our heritage from earliest times and represents a cornerstone of our national liberty." *United States Postal Serv. v. Hustler Magazine, Inc.*, 630 F. Supp. 867, 872 (D.D.C. 1986). It is a right long-recognized as implicit in "the very idea of a government, republican in form." *United States v. Cruikshank*, 92 U.S. 542, 552 (1875). Courts

have protected this right when its existence has arisen in varied contexts, from prisons, *Cruz v. Beto*, 405 U.S. 319, 321 (1972), to state capitols. *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963). And they have protected the right to petition in varied forms, from peaceful boycotts of private businesses, *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 907-11 (1982), to sending pornographic magazines through the mail to members of Congress. *Hustler Magazine, Inc.*, 630 F. Supp. at 872.

Though the right to speak and the right to petition are related, they are not duplicative. "The right to petition allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives, whereas the right to speak fosters the public exchange of ideas that is integral to deliberative democracy as well as to the whole realm of ideas and human affairs." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388 (2011). Accordingly, the Supreme Court has counseled courts not to "presume . . . that Speech Clause precedents necessarily and in every case resolve Petition Clause claims." *Id.* Boebert's blocking of Buentello violates the Petition Clause even if the interactive space associated with the @laurenboebert account is not a public forum. This is because the @laurenboebert page is, among other things, a channel through which ordinary citizens can petition Boebert directly about her official actions and policies. Indeed, the Supreme Court observed just last term that social media's interactive features make it especially suited to this purpose. *Packingham*, 137 S. Ct. at 1735 ("[O]n [social media], users can petition their elected representatives and otherwise engage with them in a direct manner."); *cf. Mirabella v. Villard*, 853 F.3d 641, 647 (3d Cir. 2017) (addressing petition via email). Buentello was banned after she used the channel for the purpose of petitioning Boebert about her official actions. *See Guarnieri*, 564 U.S. at 394–95 (noting that petitions "assume an added dimension when they seek to advance political, social, or

other ideas of interest to the community as a whole").[9] Thus, Buentello's right to petition the government here has an "added dimension" of entitlement to protection. *See id.* Courts have consistently held that blocking constituents on social media implicates the First Amendment right to petition. *Am. Atheists*, 2019 U.S. Dist. LEXIS 230493, at *82; *Leuthy*, 2018 U.S. Dist. LEXIS 146894, at *49.

Buentello, of course, does not contend that Boebert is under any mandate to create and maintain the @laurenboebert page as a channel through which members of the public may exercise their Petition Clause rights. Having made the channel available, however, Boebert cannot constitutionally close the channel solely to those who disagree with her. *See Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 680 (1996) (noting that "the government has no legitimate interest in repressing" "ordinary citizens['] . . . viewpoints on matters of public concern"); *Lamb's Chapel v. Ctr. Moriches Union Free School Dist.*, 508 U.S. 384, 394 (1993) ("[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others."); *Mirabella*, 853 F.3d at 649–50 (holding retaliation for petition activity unconstitutional).

    4.1.3  <u>Boebert's blocking of Buentello violates the Colorado Constitution's free speech clause.</u>

In Colorado, "[t]he First Amendment is a floor, guaranteeing a high minimum of free speech, while our own Article II, Section 10 is the 'applicable law' under which the freedom of speech in Colorado is further guaranteed." *Bock v. Westminster Mall Co.*, 819 P.2d 55, 5 (Colo. 1991) (citation omitted). The Colorado Supreme Court has stated that the Colorado Constitution

---

[9] The First Amendment protects the right to petition even when the right is exercised in a manner that officials deem to be offensive. *See, e.g., Hustler Magazine, Inc.*, 630 F. Supp. at 871 ("As elected representatives of the people," members of Congress "cannot simply shield themselves from undesirable mail in the same manner as an ordinary addressee.").

"guarantees greater protections of . . . rights of speech than is guaranteed by the First Amendment." *Id.* at 58. The Colorado Supreme Court did so consistent with the Supreme Court of the United States' decision in *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980), wherein the Court "explicitly acknowledged each State's 'sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution.'" *Bock*, 819 P.2d at 59 (quoting *PruneYard Shopping Center*, 447 U.S. at 81).

For the reasons outlined *infra*, because Boebert's actions violate the First Amendment, Boebert's actions also violate Buentello's more expansive free speech rights under the Colorado Constitution.

### 4.2 **Buentello will suffer irreparable harm absent issuance of an injunction.**

Buentello meets the second factor, "irreparable harm," because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *See Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012) ("[W]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."); *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019) (formally adopting the "constitutional-violation-as-irreparable-injury principle"). The injury to Buentello's speech rights is tangible and real. As a result of the banning, Buentello cannot view, reply to posts made on, or read replies to tweets on the @laurenboebert page. No conceivable government interest could justify the imposition of this burden on Buentello's core political speech. *See, e.g.*, *Tam*, 137 S. Ct. at 1765 ("[I]t is a fundamental principle of the First Amendment that the government may not punish or suppress speech based on disapproval of the ideas or perspectives the speech conveys.");

*Rosenberger*, 515 U.S. at 829 (observing that viewpoint discrimination is "blatant," "egregious," and presumptively unconstitutional).

And, the fact that Buentello may be able to express her views elsewhere on Twitter, or on the Internet, does not alleviate the injuries he has suffered. "If restrictions on access to a . . . public forum are viewpoint discriminatory, the ability of a group to exist outside the forum would not cure the constitutional shortcoming." *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings College of Law v. Martinez*, 561 U.S. 661, 690 (2010); *see also Reno*, 521 U.S. at 879–80 (rejecting the government's suggestion that, under the statute at issue, the speaker's ability to post content elsewhere on the Internet would suffice to cure the constitutional harm).

Absent an injunction, Buentello continues to be foreclosed from engaging in First Amendment free speech and from petitioning the government. Because Buentello has established that she is likely to succeed on the merits, she has also established irreparable harm as the result of the deprivation of his First Amendment rights. *See, e.g.*, *See Cmty. Communications v. City of Boulder*, 660 F.2d 1370, 1376 (10th Cir. 1981); *Johnson*, 194 F.3d at 1163.

### 4.3 The balance of harms weighs in favor of issuing an injunction.

The injury to a plaintiff deprived of his or her legitimate First Amendment rights almost always outweighs potential harm to the government if the injunction is granted. *Awad*, 670 F.3d at 1131; *Johnson*, 194 F.3d at 1163; *see also Free the Nipple-Fort Collins*, 916 F.3d at 806. Additionally, there is no rational argument that Boebert would be harmed by unblocking Buentello. Thus, in the absence of harm to Boebert, and considering that the continued banning of Buentello from reading and replying to Boebert's tweets on her @laurenboebert account violates Buentello's First Amendment rights, the balance of harms weighs in Buentello's favor.

### 4.4 It is in the public interest to issue an injunction.

Injunctions blocking state action that would otherwise interfere with First Amendment rights are consistent with the public interest. *Elam Constr. v. Reg. Transp. Dist.,* 129 F.3d 1343, 1347 (10th Cir.1997) ("The public interest . . . favors plaintiffs' assertion of their First Amendment rights."); *Utah Licensed Beverage Ass'n*, 256 F.3d at 1076; *Johnson,* 194 F.3d at 1163; *Local Org. Comm., Denver Chap., Million Man March v. Cook*, 922 F. Supp. 1494, 1501 (D. Colo. 1996). In other words, "it is always in the public interest to prevent a violation of a party's constitutional rights." *Awad*, 670 F.3d at 1132; *Free the Nipple-Fort Collins*, 916 F.3d at 807. Again, Boebert's actions continue to violate Buentello's First Amendment rights. This factor weighs strongly in Buentello's favor.

## 5. **Request for Relief**

Buentello asks that this Court require Boebert unblock Buentello on Twitter from the @laurenboebert account and enjoin Boebert from blocking Buentello in the future.

## 6. **Bond**

Normally, a party awarded a preliminary injunction normally must "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). However, the Tenth Circuit has held, that "a trial court may, in the exercise of discretion, determine a bond is unnecessary to secure a preliminary injunction if there is an absence of proof showing a likelihood of harm." *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987) (internal quotation marks omitted); *see also* 11A Charles Alan Wright et al., *Federal Practice & Procedure* § 2954 n.29 (3d ed., Apr. 2016 update) (citing public rights cases where the bond was excused or significantly reduced). Issuance of an injunction would not harm

Boebert and, therefore, Buentello asks that this Court waive bond (or set it at a nominal amount) in issuing an injunction.

7. **Conclusion**

Buentello respectfully requests that this Court grant her Motion for Preliminary Injunction, require that Boebert unblock her from the @laurenboebert account, and enjoin Boebert from blocking her in the future.

DATED this 17th day of January 2021.

KILLMER, LANE & NEWMAN, LLP

*s/ Andy McNulty*

_____

David A. Lane
Andy McNulty
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
(303) 571-1001
dlane@kln-law.com
amcnulty@kln-law.com

ATTORNEYS FOR PLAINTIFF