**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| BRIANNA BUENTELLO,<br><br>　　　　　　　　　　*Plaintiff*,<br><br>　　v.<br><br>LAUREN BOEBERT, in her official capacity,<br><br>　　　　　　　　　　*Defendant*. | Case No. 1:21-cv-00147 |

<u>**CONGRESSWOMAN LAUREN BOEBERT'S OPPOSITION TO MS. BUENTELLO'S**</u>
<u>**MOTION FOR PRELIMINARY INJUNCTION**</u>

Defendant the Honorable Lauren Boebert, United States Representative for the Third Congressional District of Colorado, in her official capacity, respectfully requests that the Court deny Plaintiff Brianna Buentello's Motion for Preliminary Injunction (Motion).

## BACKGROUND

In both her Complaint and Motion, Ms. Buentello has confused Lauren Boebert's personal and official capacities,[1] muddying the issue to the point where she now improperly requests injunctive relief against Representative Boebert only in her *official* capacity for actions that she allegedly took on her *personal* Twitter account.  As set forth below, Ms. Boebert was acting solely in her personal capacity when she took the action alleged in the Complaint, not as a Member of Congress, and therefore could not have violated Ms. Buentello's rights under the First Amendment or the Colorado Constitution.

---

[1] For clarity, this response refers to Lauren Boebert, in her personal capacity, as "Ms. Boebert," and, in her official capacity, as "Representative Boebert" or "the Congresswoman."

I.      **Procedural Background**

On January 17, 2021, Ms. Buentello filed both her Complaint and Motion against Lauren Boebert "in her official and individual capacities."  Compl. at 1 (ECF No. 1); Mot. at 1 (ECF No. 2).  In essence, Ms. Buentello claims that her First Amendment rights were violated when Ms. Boebert allegedly "blocked" Ms. Buentello from accessing the former's Twitter account.  Ms. Buentello alleges that being blocked is a violation of her First Amendment rights to free speech, to petition the government, and against retaliation, as well as a free speech violation under the Colorado Constitution.  *See generally* Compl. at 25-28.  Ms. Buentello's Motion seeks a preliminary injunction that would "require Boebert [to] unblock Buentello on Twitter from the @laurenboebert account and enjoin Boebert from blocking Buentello in the future."  Mot. at 28.

Shortly after Ms. Buentello served Lauren Boebert in her personal and official capacities, the Court dismissed the personal capacity claims at Ms. Buentello's own request.  *See* Pl.'s Notice of Vol. Dismissal (Mar. 2, 2021) (ECF No. 18); Order of Dismissal (Mar. 8, 2021) (ECF No. 23).  As a result, the Court is left only with the request to enjoin Representative Boebert, in her official capacity, for allegations arising solely from the @laurenboebert Twitter account, which is Ms. Boebert's personal account, not her official one.

II.     **The Two Entirely Separate Twitter Accounts of Ms. Boebert on the One Hand and Representative Boebert on the Other**

Ms. Buentello's Motion and Complaint rest on the patently false premise that the @laurenboebert Twitter account is the Congresswoman's "official" account.  The Motion incorrectly labels the @laurenboebert account as an "official Twitter page" and inaccurately claims that Representative Boebert "operates @lauenboebert in her capacity as United States Representative for Colorado's Third Congressional District."  Mot. at 3, 6.  The Complaint also incorrectly asserts that Representative Boebert's "@laurenboebert [Twitter account] functions as

Boebert's Official Twitter page." Compl. at 15. Further, aside from two screenshots of Ms. Buentello's own tweet, *see* Compl. at 23, Pl.'s Decl. at 8 (ECF No. 2-1), the Motion and Complaint cite only to Ms. Boebert's personal Twitter account, @laurenboebert. *See, e.g.*, Mot. at 1, 14, 21; Compl. at 2, 6, 7, 21. Neither filing discusses the Twitter account Representative Boebert maintains in her official capacity, @RepBoebert.

To be clear, like many Members of Congress, Ms. Boebert has two entirely distinct Twitter accounts, but the Motion and Complaint only challenge actions taken on Ms. Boebert's personal account, @laurenboebert. *See* Ex. A, Decl. of Rep. Boebert. That personal account was created on December 8, 2019—the same day Ms. Boebert declared her candidacy for the Congressional seat she now holds. *Id.* at 1. Ms. Boebert created this account to communicate her political views to potential voters and other political actors—and it has been used for that purpose ever since. *Id.* Ms. Boebert has also used this account for campaign purposes, including campaign fundraising. *Id.*; *see also* Pl.'s Decl. at 6. Indeed, the account includes a link to the campaign's fundraising page that is easily visible to the public. Ex. A at 1-2.[2] Ms. Boebert is the owner and operator of this personal account. *Id.* at 1. Most importantly, none of Representative Boebert's Congressional staff have ever operated this account, nor do any of them have the log-in credentials to do so. *Id.* at 4-5; Ex. B, Decl. of Jeff Small, at 2.

In fact, Representative Boebert has a distinct Twitter page that she uses for official purposes, @RepBoebert, Ex. A at 4-5, which the Motion and Complaint reference only by inclusion of two screen shots of Ms. Buentello's tweet, *see* Compl. at 23, Pl.'s Decl. at 8. On

---

[2] As Ms. Buentello notes, this part of Ms. Boebert's personal account did previously describe herself as the Congresswoman for CO-03. *See* Pl.'s Decl. at 2. The same part of the account included a link to the Lauren Boebert for Congress fundraising website, as it does now. *See id.*

December 28, 2020, as then-Representative-elect Boebert was preparing to take office, she created the @RepBoebert Twitter account with the assistance of the Committee on House Administration, which is a standing committee of the House of Representatives that, among other duties, assists incoming Members with various tasks related to setting up their Congressional Offices, including the creation of official social media accounts. *See* Ex. A at 2; Ex. B. at 2. Unlike Ms. Boebert's personal Twitter account, the official House account is operated using official House resources, including the time the Congresswoman's Congressional staff has spent operating the account. Ex. A at 3-5; Ex. B at 2-3. The biographical information in this account includes a link to the Congresswoman's official House website and the label "Congresswoman (CO-3)." *See* Ex. A at 3-4.

This official Twitter account, in contrast to Ms. Boebert's personal account, was created to communicate the Congresswoman's views to her constituents as part of her official and representational duties as a Member of Congress. Ex. A at 3-5; Ex. B at 2. In recognition of the need to inform her constituents of this fact, on January 3, 2021, Ms. Boebert tweeted from her personal account, "If you want to follow my Congressional account, where important district info & official Congressional business will be posted, join me over at @RepBoebert. This account will remain my personal account!" *See* Lauren Boebert (@laurenboebert), Twitter (Jan. 3, 2021, 8:52 AM), https://twitter.com/laurenboebert/status/1345729805023588353.

The Congresswoman views the @RepBoebert account as her official House Twitter account. Ex. A at 3-5. Significantly, Ms. Buentello is not currently blocked from accessing the official Twitter account, nor has she ever been. Ex. A at 4; Ex. B at 2. Indeed, *no* Twitter users have ever been blocked from Congresswoman Boebert's official Twitter account. *Id.*

4

The Congresswoman, her staff, and the House all view these two Twitter accounts as separate and distinct.  *See* Ex. A at 4-5; Ex. B at 2-3.  Ms. Buentello acknowledged this distinction in one of her own tweets, in which she wrote, "Good news is, she [Representative Boebert] can't shut down your account or block you from her RepBoebert account. She can block you on her personal one though— nevertheless, keep being funny and awesome. It'll make 2021 go by faster!"  *See* Bri Buentello (@Bri4CO), Twitter (Jan. 3, 2021, 2:25 PM), https://twitter.com/Bri4CO/status/1345813478628474880.

The Congresswoman's two Twitter accounts are used for different purposes and are operated with separate resources.  *See* Ex. A at 4-5; Ex. B at 2-3.  And it would violate various Congressional rules and laws if Representative Boebert used any of her Congressional staff, equipment, or other resources to in any way operate her personal account.  Unsurprisingly, therefore, in the Congresswoman's view, she has always acted in her private capacity when she has operated the @laurenboebert Twitter account.  Ex. A at 5.

## ARGUMENT

This Court should deny the Motion for Preliminary Injunction because it ignores the critical distinction between the Congresswoman's personal and official Twitter accounts, a mistake fatal to each of Ms. Buentello's legal arguments.  The Motion alleges only that Ms. Boebert blocked Ms. Buentello from accessing her personal Twitter account, @laurenboebert.  Ms. Boebert, however, operates that Twitter account in her individual capacity, not as a state actor.  For that reason, there is no likelihood that Ms. Buentello can obtain the requested relief from the sovereign for private acts allegedly taken when Ms. Boebert was operating her personal Twitter account.  Ms. Buentello's Motion disregards the well-established legal distinctions between the Congresswoman's official and individual legal personas.  *See generally Karcher v.*

*May*, 484 U.S. 72, 78 (1987). Further, without any state action, Ms. Buentello lacks standing to obtain relief from the Congresswoman. The lack of governmental involvement with Ms. Boebert's personal Twitter account similarly precludes Ms. Buentello from succeeding on her state law claim. In short, because Ms. Boebert was not acting in her official capacity when she operated her personal Twitter account, Ms. Buentello cannot prevail on any official capacity claims.

For related reasons, the other preliminary injunction factors also weigh in favor of denying the motion. Ms. Buentello would not face irreparable harm absent an injunction because she does not have a legally cognizable right to unhindered access to Ms. Boebert's personal Tweets. The balance of potential harms also counsels in favor of denying the extraordinary remedy Ms. Buentello seeks here: a preliminary injunction to require the Office of the Third Congressional District of Colorado to restrict Ms. Boebert's ability to operate her personal Twitter account. And finally, the public interest supports denying the Motion, which could have far-reaching chilling effects on all Members of Congress, whose official social media use is already governed by numerous laws and rules.

## I.     A Preliminary Injunction Should Be Denied Because It Would Ignore the Distinction Between State Action and Private Conduct

Before addressing the preliminary injunction factors in detail, it is important to clarify what precisely is before the Court. Although the Motion was originally styled as seeking relief from the Congresswoman in both her official and individual capacities, *see* ECF No. 2, the Court has since granted dismissal of all individual capacity claims, *see* ECF No. 18. Thus, the Court must decide only whether to grant Ms. Buentello's requested preliminary injunction against the Congresswoman in her official capacity, which is the equivalent of issuing an injunction against the Office of the Third Congressional District of Colorado.

**A.    Ms. Boebert's Personal Twitter Account, @laurenboebert, Is Separate and Distinct from the Congresswoman's Official Twitter Account, @RepBoebert**

Whether an individual is sued in his or her official or individual capacity is not an academic question.  At bottom, an official capacity suit "is not a suit against the official but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).  Official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).  Because the governmental entity is the real party in interest, "the entity's 'policy or custom' must have played a part" in the alleged violations of federal or state law. *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (quoting *Graham*, 473 U.S. at 166).

Individual capacity suits, by comparison, "seek to impose personal liability upon a government official for actions [taken] under color of state law." *Graham*, 473 U.S. at 165.  A plaintiff in an individual capacity suit must show that the "official, acting under color of state law, caused the deprivation of a [legal] right," *id.* at 166, but "need not establish a connection to governmental 'policy or custom.'" *Hafer*, 502 U.S. at 25 (quoting *Graham*, 473 U.S. at 166-67).  Monetary damages are available in individual capacity suits because they target the individual behavior of an official, not a government policy.

The Supreme Court has observed that "acts performed by the same person in two different capacities are generally treated as the transactions of two different legal personages." *Karcher*, 484 U.S. at 78 (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 543 n.6 (1986) (cleaned up)).  The "concept of 'legal personage' is a practical means of identifying the real interests at stake in a lawsuit." *Id.* (quoting *Bender*, 475 U.S. at 543-44).  The Court has "repeatedly recognized that the real party in interest in an official-capacity suit is the entity represented and not the individual officeholder." *Id.* (citing cases).

7

Here, the real party in interest is not the sovereign, it is the officeholder, Ms. Boebert, who operates the @laurenboebert Twitter account in her individual capacity.  The Motion targets Ms. Boebert not as a proxy for the sovereign, but for alleged private actions on her personal Twitter account that cannot possibly be repeated by the Congresswoman's successor-in-office (who will not have control over Ms. Boebert's personal Twitter account).  Similarly, the Motion seeks no relief from the office that Ms. Boebert holds and alleges no policy in the Office of the Third Congressional District regarding the officeholder's social media accounts.  Simply put, the Motion does not seek any relief that the Office of the Third Congressional District can possibly grant because that office does not control Ms. Boebert's personal Twitter account.  *Cf. Lewis v. Clarke*, 137 S. Ct. 1285, 1290 (2017) (directing, in the context of a motion to dismiss for sovereign immunity, that courts "may not simply rely on the characterization of the parties in the complaint, but rather must determine in the first instance whether the remedy sought is truly against the sovereign").

> **B.**      ***Representative Boebert, Like All Members of Congress, Is Subject to Numerous Laws and Rules That Govern Her Official Twitter Account, But Not Her Personal Account***

For Members of Congress, the distinction between official capacity and personal capacity acts is well-trodden ground.  All Members of Congress are subject to numerous federal laws, Congressional rules, and other regulations regarding the distinction between official and non-official resources.  Members of the House must comply with House Rules; regulations and guidance promulgated by various House entities (e.g., the Committee on House Administration (CHA), the Committee on Ethics, the Franking Commission, and the House Office Building Commission); federal statutes, including criminal laws; and certain federal regulations.

The social media accounts of Members of the House are expressly regulated.  Members are required to keep official social media pages separate from personal and/or campaign pages. *See* U.S. House of Representatives, Comm. on House Admin., 116th Cong., *Members' Congressional Handbook*, at 31-32 (2020).  The Members' Congressional Handbook defines social media accounts as "profiles, pages, channels or any similar presence on third-party sites that allow individuals or organizations to offer information about themselves to the public."  *Id.* at 31.  House regulations allow Members to use official funds to create and operate official social media pages.  *Id.*

Moreover, anything posted on an official social media account "must be in compliance with Federal law and House Rules and Regulations applicable to official communications and germane to the conduct of the Member's official and representational duties."  *Id*. at 32.  Official social media pages (and websites) cannot be used for campaign or personal purposes; cannot generate, circulate, or otherwise encourage petitions; cannot include private advertisements or imply government endorsement of a product or service; and cannot include grassroots lobbying. *Id.*  A Member's official social media account must also clearly reflect the Member's official position (for example, Representative) in the account name.  *Id.* at 31-32.[3]

The House Ethics Manual further defines the distinction between official and personal resources.  *See* U.S. House of Representatives, Comm. on Standards of Official Conduct, 110th Cong., *House Ethics Manual*, (2008 ed.).  Under these rules, staff time is classified as an official House resource, *id.* at 124, which includes time spent interacting with followers on official social media, *see id.* at 300.  Accordingly, official social media accounts established by a Member to

---

[3]  There are similar rules applicable to the Senate.  *See* U.S. Senate, Committee on Rules and Administration, *Internet Services and Technology Resources Usage Rules*, 114th Cong., Nov. 9, 2015, at https://www.senate.gov/usage/internetpolicy.htm.

communicate information as part of the Member's representational or legislative capacity are considered official House resources.

Additionally, official social media accounts cannot be directly linked or refer to websites created or operated by a campaign or campaign-related entity. *See id.* at 131. The House Committee on Ethics similarly counsels that a Member's campaign websites and social media pages may not include a link to the Member's official House website unless the Committee approves specific disclaimer language in advance. *See id.*; U.S. House Comm. on Ethics, Mem., *Change in Rules Regarding Providing a Hyperlink from Campaign Internet Sites to Official Internet Sites* (Mar. 9, 2012).[4]

Notwithstanding these rules, Members are free to maintain personal social media accounts, which are not subject to these House Rules and regulations. *See* Members' Congressional Handbook at 1-2. Members are prohibited from using non-official resources, such as campaign funds or campaign staff time, to operate official social media accounts. *Id.* at 2.

Members must also comply with similar requirements under federal law. In general, official funds may only be used for the purpose for which they were appropriated. *See* 31 U.S.C. § 1301(a). Thus, House resources cannot be used to conduct campaign activity. *See id.*; *see also* 2 U.S.C. § 503(d) (limitations on use of campaign funds). Members and Congressional staff must also comply with criminal laws such as 18 U.S.C. § 607, which generally prohibits the solicitation and receipt of campaign contributions in any federal building, and 18 U.S.C. § 602, which prohibits Members, officers, and employees from knowingly soliciting a federal campaign contribution from any other federal officer or employee.

---

[4] Available at https://ethics.house.gov/sites/ethics.house.gov/files/ethicscommittee%40mail.house_.gov_20120312_175122.pdf.

The two Twitter accounts at issue here illustrate these critical distinctions.  Ms. Boebert's personal account, @laurenboebert, links to her campaign fundraising page, while the Congresswoman's official account, @RepBoebert, links to her official House website.  Ex. A; *see also* Pl.'s Decl. at 2, 6 (including screen shots of the @laurenboebert account with links to Ms. Boebert's campaign fundraising website).  The personal account was created the same day Ms. Boebert announced her candidacy, over a year before she eventually took office; the official account was created only shortly before she took office, with the explicit intent of establishing an official House account.  Ex. A at 1, 2.  The personal account handle, @laurenboebert, includes only Ms. Boebert's name, while the official account handle, @RepBoebert, includes her formal title.  And only Representative Boebert's official House Twitter account, @RepBoebert, is operated with official House resources.  *See* Ex. A at 3-5; Ex. B at 2.

As explained further below, this Court should reject Ms. Buentello's attempt to ignore the Congresswoman's official Twitter account and blur the line between state action and private conduct.

**II.      Ms. Buentello Cannot Establish the Factors Necessary to Obtain a Preliminary Injunction**

Injunctive relief is "an extraordinary remedy" that a court should only grant "upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citation omitted).  A plaintiff must establish: "(1) a substantial likelihood of success on the merits of the case; (2) irreparable injury to the movant if the preliminary injunction is denied; (3) the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction; and (4) the injunction is not adverse to the public interest."  *Valley Cmty. Pres. Comm'n v. Mineta*, 373 F.3d 1078, 1083 (10th Cir. 2004) (citation omitted).

11

Certain preliminary injunctions are disfavored. *See Schrier v. Univ. of Co.*, 427 F.3d 1253, 1259 (10th Cir. 2005). For example, courts disfavor injunctions that seek to alter the status quo or affirmatively require the nonmovant to act in a particular way, such that the court would have to supervise the nonmovant's ongoing compliance with the order. *Id.* at 1259-61. Requests for these disfavored injunctions "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Id.* at 1259 (citation omitted).

### A.   *Ms. Buentello Cannot Establish a Likelihood of Success on the Merits*

To obtain a preliminary injunction, Ms. Buentello must show that there is a "substantial likelihood of success on the merits of the case." *Valley Cmty.*, 373 F.3d at 1083. In this Circuit, this factor can be "somewhat relaxed" if the movant establishes the other three factors in her favor. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003). To succeed on the merits of her federal claims, Ms. Buentello would have to prove that Ms. Boebert was engaging in state action when she allegedly blocked Ms. Buentello, *see Niere v. St. Louis Cty., Mo.*, 305 F.3d 834, 838 (8th Cir. 2002) ("The First Amendment applies only to state actors[.]"), which she has not done and cannot do. For similar reasons, Ms. Buentello's state law claim fails as well.

#### 1.   *Ms. Boebert Is Not a State Actor When Operating Her Personal Twitter Account*

To determine whether conduct amounts to state action, courts consider the totality of circumstances. *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 614-15 (1989). There must be a "sufficiently close nexus" between the government and the private action such that the private action "may be fairly treated" as that of the government itself. *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974). A "defendant acts under color of state law when she deprives the plaintiff of a right through the exercise of authority that she has by virtue of her government

office or position." *Butler v. Sheriff of Palm Beach Cnty.*, 685 F.3d 1261, 1265 (11th Cir. 2012). The "dispositive question" in the state action inquiry "is whether the defendant was exercising the power she possessed based on state authority or was acting only as a private individual." *Id.* "Faithful adherence" to the state action requirement necessitates "careful attention to the gravamen" of the complaint. *Blum v. Yaretsky*, 457 U.S. 991, 1003 (1982).

The distinction between state action and private conduct is essential to proper application of the First Amendment. It is axiomatic that the First Amendment "is a restraint on government action, not that of private persons." *Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 114 (1973) (opinion of Burger, C.J.) (citation omitted). Both the First Amendment and 42 U.S.C § 1983, which often provides the accompanying right of action, are restricted to government abridgment of speech. *See Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019); *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999). This does not change even if private individuals "open their property for speech." *See Manhattan Cmty. Access*, 139 S. Ct. at 1930-31. Individuals who hold public office routinely engage in personal acts that are not exercises of state power. *See Van Orden v. Perry*, 545 U.S. 677, 723 (2005) (Stevens, J., dissenting) ("[W]hen public officials deliver public speeches, we recognize that their words are not exclusively a transmission from *the* government because those oratories have embedded within them the inherently personal views of the speaker[.]").

Here, the question is whether Ms. Boebert "exercised power 'possessed by virtue of [federal] law'" when she allegedly blocked Ms. Buentello from the @laurenboebert account, such that the blocking was "made possible only because [Ms. Boebert] is clothed with the authority of [federal] law." *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). This determination is "necessarily fact-bound." *Lugar v.*

*Edmondson Oil Co., Inc.*, 457 U.S. 922, 939 (1982).  It will turn on a number of factors, including whether the alleged blocking "results from the [government]'s exercise of coercive power" or with the government's "significant encouragement"; was caused by a private actor operating "as a willful participant in joint activity" with the government; is controlled by a government agency; or is "entwined" with governmental policies, management, or control.  *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295-96 (2001).

Ms. Boebert's alleged decision to block Ms. Buentello implicates none of these factors. It was a private action that did not involve any "right or privilege created by the State."  *Sullivan*, 526 U.S. at 50 (citation omitted).  The blocking at issue was clearly alleged to be on Ms. Boebert's personal Twitter account, not her official House account.  Nor was this action "made possible only because [Ms. Boebert] is clothed with the authority of [federal] law."  *West*, 487 U.S. at 49 (citation omitted).[5]  Indeed, Ms. Boebert would still be able to block Ms. Buentello from her personal Twitter account even after leaving office.

This analysis follows the official-personal capacity analysis above.  Because Ms. Buentello is improperly proceeding against the Congresswoman in her official capacity for operating her personal Twitter account, there is no substantial likelihood of prevailing on the merits of her claims.  When Ms. Boebert operates her personal Twitter account, she is not taking any official action and is not a state actor for First Amendment purposes.

> ### 2. *Ms. Buentello Relies on Inapposite Case Law in an Attempt to Establish State Action Here*

Among the three appellate court rulings that, to date, have developed the applicable law when a government official blocks a social media user, Ms. Boebert's personal Twitter account

---

[5]  This stands in stark contrast to the Congresswoman's official Twitter account, @RepBoebert, which was conferred to her by virtue of her office.  *See* Ex. A at 2-3; Ex. B at 2.

most closely resembles the social media account at issue in *Campbell v. Reisch*, 986 F.3d 822 (8th Cir. 2021). *See also Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019), *petition for cert. filed*, (U.S. Aug. 20, 2020) (No. 20-197); *Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019). None of these cases, however, is so clearly established or binding in this Circuit such that Ms. Buentello can establish the substantial likelihood of success needed to prevail on her Motion.[6]

In *Campbell*, the Eighth Circuit held that a state legislator, Cheri Reisch, was not acting under color of state law when she blocked an individual from her personal social media account. *Campbell*, 986 F.3d at 823-24. The court ultimately ruled that Reisch was not a state actor when operating her social media account because "she used it overwhelmingly for campaign purposes." *Id.* at 826. As support, the court cited the following facts: (i) Reisch created the account the day before she announced her candidacy; (ii) she solicited donations to her campaign on the account; and (iii) she used it to convince voters she was fit for public office. *See id.* Although Reisch "occasionally used the account to provide updates on where certain bills were in the legislative process or the effect certain recently enacted laws had had on the state," these types of messages were "fully consistent with Reisch using the account to tout her record because they show voters that she was actively advancing her legislative agenda and fulfilling campaign promises." *Id.*; *see also id.* at 822 (noting that a personal social media account can

_____

[6] There are two other Circuit court cases that address these issues, though in less detail. *See Robinson v. Hunt Cnty., Tex.*, 921 F.3d 440 (5th Cir. 2019) (assuming "for the purposes of this case," without any argument otherwise, that the government Facebook page was a forum subject to the First Amendment); *Attwood v. Clemons*, 818 Fed. Appx. 863 (11th Cir. 2020) (unpublished) (denying state legislator's interlocutory appeal regarding Eleventh Amendment and legislative immunity issues). There are also numerous district court cases that address a government official's moderation of social media comments. *See, e.g.*, footnote 8.

transform into an official one if it becomes "an organ of official business, but that is not what happened here").

Like the personal account in *Campbell*, Ms. Boebert created her personal @laurenboebert Twitter account the day she announced her candidacy for public office and since that time has used it for political and campaign purposes—including the solicitation of campaign donations. *See* Ex. A at 1-2. Also like in *Campbell*, Ms. Buentello has not alleged that Ms. Boebert has used her personal Twitter account an "organ of official business," as opposed to merely mentioning political topics related to her job. *Campbell*, 986 F.3d at 822.

*Campbell* found that Reisch's posts were "quite clearly an effort to emphasize her suitability for public office," even though they sporadically mentioned the legislator's official duties. *Campbell*, 986 F.3d at 827. Similarly, though Ms. Buentello has made threadbare allegations of official capacity conduct, the substance of her allegations aligns with the types of political messages that *Campbell* found are private conduct. *Compare id.* at 826-27 *to* Pl.'s Decl. at 4-7 (including screen shots from Ms. Boebert's personal Twitter account about various political topics).

In breaking with *Knight* and *Davison*, *Campbell* concluded that the supposed "trappings" of an official account—for example, a social media account handle that reflected the office Reisch was pursuing and a photograph of herself working at the job—were "just too equivocal to be helpful here." *Id.* And the "occasional stray messages that might conceivably be characterized as conducting the public's business [were] not enough to convert Reisch's account into something different from its original incarnation." *Id.* So too here, where Ms. Boebert's tweets about political topics like those cited in the Motion and Declaration do not transform her personal account, which has always been used for campaign purposes, into an official account—

especially given that Representative Boebert uses a separate official Twitter page for official House business. *See* Ex. A at 3-5; Ex. B at 2.

In arguing to the contrary, Ms. Buentello relies heavily on *Knight* and *Davison*, two cases that are plainly distinguishable from this case. In *Knight*, the Second Circuit held that President Trump had violated the First Amendment when he blocked several users from his @realdonaltrump Twitter account. *See Knight*, 928 F.3d at 231. The "evidence of the official nature of the Account [was] overwhelming." *Id.* at 234. President Trump and members of his administration operated the account and used it for official government purposes, including to announce official Presidential decisions such as appointments and firings of Presidential appointees and to engage with foreign leaders. *Id.* at 232. The President and his staff also used the account to announce and describe Administration policies and to promote their legislative agenda. *Id.* at 236. Further, the White House press secretary described the account's tweets as "official statements" and the National Archives formally deemed the tweets "official." *Id.* at 231-32. Even though President Trump created the account before he took office, once he took office, he used it "unabashedly" for official purposes. *See Campbell*, 986 F.3d at 826 (discussing *Knight*). There was no evidence that the President used the account to solicit campaign donations. *See Knight*, 928 F.3d at 231. The "uncontested evidence in the record of substantial and pervasive government involvement with, and control over, the account" led the Second Circuit to conclude that President Trump's use of the account was public, not private. *Id.* at 235.

*Knight* did not presume to announce a rule applicable in all instances when a government official moderates his or her private social media account. The Second Circuit prudently noted that "not every social media account operated by a public official is a government account." *Id.* at 236. It will often "be a fact-specific inquiry," and the outcome will be "informed by how the

official describes and uses the account; to whom features of the account are made available; and how others, including government officials and agencies, regard and treat the account." *Id.*

In contrast to the Twitter account in *Knight*, which was operated by members of the President's staff in addition to the President himself, none of Congresswoman Boebert's Congressional staff have ever operated her personal Twitter account, @laurenboebert. *See* Ex. A at 5; Ex. B at 2. Moreover, while there was "overwhelming" evidence that the account in *Knight* was used "unabashedly" for official purposes, *see Knight*, 928 F.3d at 234, 236; *Campbell*, 986 F.3d at 826, there is no such evidence here. There is no allegation, for example, that Ms. Boebert has used her personal Twitter account to take any official action akin to President Trump's announcements about the job statuses of Presidential appointees. In fact, Ms. Boebert uses her personal account for political purposes, including to solicit campaign donations, Ex. A at 3, another difference between her account and the President's Twitter account as analyzed in *Knight*, *see* 928 F.3d at 231. Ms. Boebert uses a separate account, @RepBoebert, exclusively for official House business. Ex. A at 3.

In *Davison*, the Fourth Circuit held that the chair of a local governmental board named Phyllis Randall had violated the First Amendment when she blocked a user from her official Facebook page. *Davison*, 912 F.3d at 672-73. The specific facts of Randall's Facebook account showed that she was acting in her official capacity when she operated it. First, Randall had "created and administered the Chair's Facebook Page to further her duties as a municipal official." *Id.* at 680. She used the page "as a tool of governance" because it "provide[d] information to the public about her and the Loudoun Board's official activities and solicit[ed] input from the public on policy issues [that] she and the Loudoun Board confront[ed]." *Id.* Randall used it specifically to conduct government business, for example "to inform the public

about serious public safety events and to keep her constituents abreast of the [c]ounty's response to a snowstorm and to coordinate snow removal activities." *Id.* There was no evidence that she used the Facebook page to solicit campaign donations. *See id.* at 672-73.

Further, Randall's Facebook page bore certain "trappings" of her office, including an explicit designation that it was the page of a government official, the inclusion of Randall's official title (Chair) in the account handle, posts about official activities, posts expressly directed to her constituents, lists of official contact information, and links to the official county website. *Id.* at 680-81.  Additionally, Randall created the account the day before she was sworn in as board chair. *Id.* at 673.  She also operated separate Facebook pages for personal and campaign purposes, respectively. *Id.*

By comparison, Ms. Boebert created her personal Twitter account for the specific purpose of campaigning for public office and, accordingly, has used it for political purposes, including the solicitation of campaign donations. Ex. A at 1.  Unlike Ms. Boebert's personal account, there was no evidence that Randall used her official account to solicit campaign donations. *Compare id. to Davison*, 912 F.3d at 672-73.  Although Ms. Boebert has posted about political topics on her personal account, there are no allegations that she has used it to coordinate a government operation like the county response to a snowstorm cited in *Davison*. *See* 912 F.3d at 680.

And in *Davison*, the Facebook account included the kinds of "trappings" that are not present here because, first, the handle of Ms. Boerbert's personal account, @laurenboebert, includes only her name, while the official Twitter handle, @RepBoebert, includes her title, as compared to the Facebook page in *Davison*, which was designated as the page of Chair Randall. *See id.* at 680-81.  Second, Ms. Boebert's personal Twitter account links to a campaign

fundraising site, Ex. A at 1-2, while her official account links to her official House website, *id.* at 3-4.  *Cf. Davison*, 912 F.3d at 674 (Chair Randall's social media page included links to the official county website).  And third, *Davison* addressed the applicable law when Chair Randall operated an official social media page that was separate from her personal and campaign pages, *id.*, while Ms. Buentello targets Ms. Boebert's personal page, which is operated separately from her official page, *see* Ex. A at 4-5; Ex. B at 2.  Had Ms. Buentello alleged that she was blocked from the @RepBoebert account, this would be a very different case.  But she did not and cannot make any such allegation because she has never been blocked from the Congresswoman's official Twitter page.  *See* Ex. A at 4; Ex. B at 2.

In sum, like the account in *Campbell*, Ms. Boebert's personal Twitter account "is the kind of unofficial account that the [*Knight*] court envisioned."  *Campbell*, 986 F.3d at 826.  It "is fundamentally different from the accounts at issue in [*Knight*] and *Davison*."  *See id.*  Because "[t]he [*Knight*] and *Davison* courts were not concerned with distinguishing an official page from a campaign page as we are … they do not offer much guidance for deciding this case."  *Campbell*, 986 F.3d at 827.

Next, contrary to Ms. Buentello's assertion, Ms. Boebert's personal Twitter account "is more akin to a campaign newsletter than to anything else," including a townhall meeting.  *See id.*  In the type of townhall meetings cited by Ms. Buentello, *see* Mot. at 17 n.7, government officials are speaking in their official capacities.  On Ms. Boebert's @laurenboebert Twitter account, however, Ms. Boebert speaks in her individual capacity, much as a candidate for public office does during a campaign rally.  *See Campbell*, 986 F.3d at 825 ("Running for public office is not state action; it is a private activity.").  As a general matter, the First Amendment does not apply to campaign rallies, which are generally private forums paid for by the campaign, not by a

government entity.  *See, e.g.*, *Sistrunk v. City of Strongsville*, 99 F.3d 194, 200 (6th Cir. 1996)

(holding that an individual who challenged a city's ability to lease its public space to a

Presidential campaign, which wanted to exclude certain individuals from a campaign rally, had

"not alleged that the city violated [her] free speech rights; rather, [she] has only established that

the city permitted the [campaign] to exercise its free speech rights and autonomy over the

content of its own message").

Finally, Ms. Buentello does not explain why, if Ms. Boebert's use of Twitter is state

action, it is not also government speech that is not subject to First Amendment scrutiny.  *See*

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015) (explaining

that "government statements (and government actions and programs that take the form of

speech) do not normally trigger the First Amendment rules designed to protect the marketplace

of ideas") (citation omitted).  The First Amendment "does not regulate government speech."

*Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009); *see also Morgan v. Bevin*, 298 F.

Supp. 3d 1003, 1010-11 (E.D. Ky. 2018) (holding official Facebook page is government speech

to which First Amendment does not apply).

### 3.  *Ms. Buentello Has Not Established Standing*

The absence of state action also dooms Ms. Buentello's claim to standing.  Ms. Buentello

is the party invoking this Court's jurisdiction and bears the burden of establishing standing.

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  To establish "the 'irreducible

constitutional minimum' of standing," Ms. Buentello must show that she has "(1) suffered an

injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that

is likely to be redressed by a favorable judicial decision."  *Id.* (quoting *Lujan v. Defenders of*

*Wildlife*, 504 U.S. 555, 560-61 (1992)).  Because standing serves to prevent courts "from being

used to usurp the powers of the political branches," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013), the standing inquiry is "especially rigorous when reaching the merits of the dispute would force [the court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997).

In short, Ms. Buentello fails each standing requirement because Ms. Boebert was not engaged in state action when she allegedly blocked Ms. Buentello from her personal Twitter account. There was no injury because First Amendment rights are not implicated by a private individual's operation of a personal Twitter account. There was no traceability because Ms. Boebert was not a state actor when she allegedly took the actions forming the basis of Ms. Buentello's suit. And finally, Ms. Buentello's grievance with Ms. Boebert cannot be redressed by this Court because she seeks relief from the Congresswoman's office for acts taken by the officeholder, a legally distinct "personage." *See Karcher*, 484 U.S. at 78.

### 4. Ms. Buentello Cannot Prevail on Her State Law Claim

To the extent that Ms. Buentello's state law claim survived her dismissal of the individual capacity claims, the lack of governmental involvement in Ms. Boebert's personal Twitter account precludes Ms. Buentello from succeeding on that claim. Under the Colorado Constitution, every person is guaranteed the freedom "to speak, write or publish whatever he will on any subject." Colo. Const. Art. II, § 10. This clause applies not only to state actors, but also when (1) "governmental entities or public monies are shown by the facts to subsidize, approve of, or encourage private interests" and (2) those "private interests happen also to restrict the liberty to speak and dissent." *See Rouse v. City of Aurora*, 901 F. Supp. 1533, 1540-41 (D. Colo. 1995) (discussing *Bock v. Westminster Mall Co.,* 819 P.2d 55, 60 (Colo. 1991)).

Two cases dealing with private shopping centers establish the degree of "governmental involvement" needed to conclude that Article II, section 10 could apply to private entity.  *See id.* In *Bock*, there was substantial "governmental involvement" in the operation of a private mall, including: (i) "the financial participation of the City in the Mall's progress"; (ii) an onsite "City police substation"; and (iii) "the active presence of other governmental agencies in the common areas of the Mall."  *Bock*, 819 P.2d at 62.  But in *Rouse*, there was "no evidence of the type of governmental involvement" with a private shopping center because, unlike the mall in *Bock*, the private shopping center was not supported financially by the government and did not have any onsite government offices.  *Rouse*, 901 F. Supp. at 1540-41.

Here, there is no governmental involvement in the operation of Ms. Boebert's personal Twitter account.  Indeed, that account is operated solely with non-official resources, Ex. A at 4-5, consistent with Congressional rules and federal law, *supra* at 8-11.  Ms. Buentello's suggested interpretation of Colorado state law would have the absurd effect of requiring the Court to order the Congresswoman's office to restrict Ms. Boebert's right to "publish whatever [s]he will on any subject" on her personal Twitter account.  *See People v. Ford*, 773 P.2d 1059, 1066 (Colo. 1989) ("The object of article II, section 10 is to 'guard the press against the trammels of political power, and secure to the whole people a full and free discussion of public affairs.'" (quoting *Cooper v. People*, 22 P. 790, 798 (1889)).

Finally, Ms. Buentello's attempt to use the Colorado Constitution to hold Rep. Boebert liable in her official capacity must fail as a pure matter of law.  By suing Rep. Boebert in her official capacity, Ms. Buentello must by definition be asserting that the Congresswoman's actions as a federal official violate state law.  But the Supreme Court has long made clear that federal officials carrying out their federal responsibilities are not subject to state law unless

Congress has expressly provided otherwise by statute.  *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988) ("[F]ederal installations are shielded by the Supremacy Clause from direct state regulation unless Congress provides 'clear and unambiguous' authorization for such regulation.") (citing *EPA v. State Water Res. Control Bd.*, 426 U.S. 200, 211 (1976)); *Hancock v. Train*, 426 U.S. 167, 179 (1976) (citing *Mayo v. United States*, 319 U.S. 441, 447-48 (1943)) ("'The federal function must be left free' of regulation [by the states]." (footnote omitted)).  Ms. Buentello has pointed to no federal law applicable here making Members of Congress subject in their official capacity to the restrictions of state law with regard to management of social media accounts.

### B.      *Ms. Buentello Cannot Establish Irreparable Harm*

Irreparable harm must stem from an injury that is "certain, great, [and] actual." *Heideman*, 348 F.3d at 1189.  Irreparable harm must be beyond "merely serious or substantial." *Id.*  Ms. Buentello bears the burden of showing that her injury is "of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm."  *Id.*

Though an individual's loss of First Amendment rights for a short time can constitute irreparable harm in some circumstances, here Ms. Buentello's First Amendment right to access the Congresswoman's official Twitter account is fully intact and has never been threatened.  The only "harm" Ms. Buentello may suffer absent an injunction is the hindered access to Ms. Boebert's personal Twitter account—which is not a legally cognizable harm.  As noted above, the First Amendment "is a restraint on government action, not that of private persons." *Columbia Broad. Sys.*, 412 U.S. at 114.  To the extent Ms. Buentello wishes to interact with the Congresswoman on Twitter, she is not blocked from the Congresswoman's official Twitter

account, nor has she ever been.  *See* Ex. A at 4; Ex. B at 2.  The Congresswoman has not, in fact, blocked anyone from her official account.  *Id.*

The alleged actions forming the basis of Ms. Buentello's suit—blocking Ms. Buentello from following the @laurenboebert Twitter account—do not abridge the right to petition the government for the same reasons.  U.S. Const., Amend. I.  Because "the rights of speech and petition share substantial common ground," *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388 (2011), courts have consistently held that a Petition Clause claim cannot exceed the scope of a Free Speech Clause claim.  *See, e.g.*, *McDonald v. Smith*, 472 U.S. 479, 485 (1985) ("[T]here is no sound basis for granting greater constitutional protection to statements made in a petition to the President than other First Amendment expressions.").

In any event, the Petition Clause, like the other clauses of the First Amendment, does not create an entitlement to use Twitter to access a private individual's personal Twitter account.  Ms. Buentello's rights of free speech and to petition the government have not been violated because she is not blocked from the Congresswoman's official House Twitter account and she retains full access to all of the traditional methods of communicating with her Member of Congress (e.g., telephone, email, postal letter, in-person appointment, etc.).

### C.    The Balance of Equities Weighs in Favor of Representative Boebert

When considering the balance of equities, a court must weigh the harm the preliminary injunction would cause against the alleged harm the movant cites.  *See Winter*, 555 U.S. at 32.  The issuance of Ms. Buentello's requested injunction would result in an abridgment of Ms. Boebert's own First Amendment right to craft her campaign materials in the manner she sees fit.  *See Campbell*, 986 F.3d at 827-28 (citing *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 559 (1995)).  In this context, Ms. Boebert's free speech right "necessarily

trumps" Ms. Buentello's apparent desire to convey her own message on Ms. Boebert's campaign Twitter account. *See id.* at 827.

The Motion seeks extraordinary relief that would require a Congressional office to mandate how the individual officeholder conducts her personal affairs. If the Court were to take Ms. Buentello's expansive approach, it would be Ms. Boebert whose free speech rights would be abridged. *See id.* By comparison, denying the Motion would only preserve the status quo, where Ms. Buentello is only allegedly blocked from Ms. Boebert's personal Twitter account, but has full access to the official House account. *See* Ex. A at 4; Ex. B at 2.[7]

### D.    The Public Interest Weighs Heavily in Favor of Representative Boebert

The Court should not enter a preliminary injunction that is "against the public interest." *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 807 (10th Cir. 2019). It is always in the public interest to avoid violations of a party's constitutional rights. *Id.*

Ms. Buentello's Motion, if granted, could have extremely broad effects. Social media use is very common among Members of the House. As of 2017, almost all Representatives operated an official Twitter, Facebook, or other social media account. *See* Jacob R. Straus et al., Cong. Research Serv., R44509, *Social Media in Congress: The Impact of Electronic Media on Member Communications* 7 (May 26, 2016). It is likely that many of those Members also have at least one personal social media account as well. If the Court were to grant the injunction and

---

[7] In *Landman v. Scott*, No. 1:19-cv-01367 (D. Colo., filed May 13, 2019), the distinction between a Colorado state senator's official and personal social media pages was part of the basis for the parties' settlement of claims based on the senator allegedly blocking an individual from his official Facebook account. Order of Dismissal at 3-4 (ECF No. 29) ("It is expressly agreed and understood by the parties that the terms of this order apply only to Senator Scott's official Facebook page … and official Twitter account … and do not in any way limit or affect his ability to 'block' or 'ban' individuals or entities or delete or hide comments on his personal Facebook account … or personal Twitter account in his individual capacity.").

accept Ms. Buentello's invitation to blur the line between official and personal social media accounts, it could affect numerous Members of Congress who are not parties to this lawsuit but who likely operate their separate social media accounts similar to Representative Boebert: namely, in accordance with all applicable laws and rules. This injunction, if granted, could seriously chill the speech of many Members of Congress, inhibiting communication between Members and constituents via very popular and low-cost social media platforms. This type of communication helps citizens make informed judgments about Congressional actions and allows Members to more effectively understand and efficiently respond to their constituents' interests.

As part of the extensive body of laws and rules cited above, *supra* at 8-11, the House has prescribed its own comprehensive ethical constraints to regulate the official actions of Members of Congress, including on official social media accounts. Pursuant to its express and exclusive constitutional authority under the Rulemaking and Discipline Clause, U.S. Const. Art. I, § 5, cl. 2, the House has adopted a Code of Official Conduct that establishes enforceable ethical standards for its Members. *See* Rule XXIII, Rules of the U.S. House of Representatives, 117th Cong. (2021). These rules, as outlined above, *see supra* at 9-10, prescribe a wide range of rules for Members of Congress when using social media. In deference to the evidence that the Congresswoman is operating her accounts in accordance with those standards and Congress's ability to govern its own affairs, this Court should decline to issue the extraordinary relief sought by Ms. Buentello.

The Court should also defer to the Congresswoman's determination that the @RepBoebert Twitter account is official and the @laurenboebert account is personal. Members are in the best position to determine whether an activity is official in nature. And once a Member decides whether a particular activity, or social media account, is official or non-official,

the Member is bound by it.  *Cf.* House Ethics Manual at 179 ("A single event cannot, for purposes of the House rules, be treated as *both* political and official.").  If a Member designates a social media account as anything other than official, "no official resources may then be used."  *Id.*

Finally, if Ms. Buentello does not agree with how the Congresswoman operates either of her accounts, the best "place to register that disagreement is at the polls," or, at least, on the Congresswoman's official House Twitter page.  *See Campbell*, 986 F.3d at 827-28 (quoting *Morgan v. Bevin*, 298 F. Supp. 3d at 1013).  In recent years, lawsuits against public officials for blocking social media users on non-governmental accounts have become increasingly common.[8]  This Court should decline Ms. Buentello's invitation to open these flood gates even wider.  *Cf. Packingham v. North Carolina*, 137 S. Ct. 1730, 1744 (2017) (Alito, J., concurring) (warning that courts "should proceed circumspectly, taking one step at a time" when applying the Constitution to social media).

---

[8]  *See, e.g.*, *Phillips v. Ochoa*, No. 2:20-cv-272, 2020 WL 4905535, at *6 (D. Nev. Aug. 20, 2020) (denying plaintiff's preliminary injunction motion because he had not raised a "reasonable inference that the judge acted under the color of state law when he barred [plaintiff] and his comments from the Facebook page"); *Hikind v. Ocasio-Cortez*, No. 19-cv-3956 (E.D.N.Y. filed July 9, 2019) (parties stipulated to dismissal in suit against Congressional Representative for blocking user on personal Twitter account); *Fehrenbach v. Zeldin*, No. 17-CV-5282, 2019 WL 1320280 (E.D.N.Y. Mar. 21, 2019) (granting motion to dismiss in suit against Congressional defendant for allegedly hiding user comments on personal and official Facebook pages); *McKercher v. Morrison*, No. 18cv1054, 2019 WL 1098935 (S.D. Cal. Mar. 8, 2019) (dismissing suit because qualified immunity principles protected mayor from liability for blocking plaintiff from the mayor's personal Facebook page); *German v. Eudaly*, No. 3:17-CV-2028-MO, 2018 WL 3212020, at *3 (D. Or. June 29, 2018) (holding that plaintiff failed to allege state action against a city commissioner for blocking plaintiff from the commissioner's personal Facebook page).

## CONCLUSION

For all the reasons laid out above, this Court should deny the Motion for Preliminary

Injunction.


Dated: March 30, 2021                              Respectfully submitted,


                                                   */s/ Douglas N. Letter*
                                                   DOUGLAS N. LETTER
                                                     *General Counsel*
                                                   TODD B. TATELMAN
                                                     *Principal Deputy General Counsel*
                                                   BROOKS M. HANNER
                                                     *Associate General Counsel*

                                                   OFFICE OF GENERAL COUNSEL
                                                   U.S. HOUSE OF REPRESENTATIVES[9]
                                                   5140 O'Neill House Office Building
                                                   Washington, D.C. 20515
                                                   (202) 225-9700 (telephone)
                                                   douglas.letter@mail.house.gov

                                                   *Counsel for Representative Boebert, in her*
                                                   *official capacity*

---

[9]  The Office of General Counsel wishes to acknowledge the assistance of law clerks Lily Hsu, a student at The George Washington University Law School, and Jennifer Kaplan, a student at The Catholic University of America, Columbus School of Law, in preparing this brief.

## TYPE-VOLUME CERTIFICATION

1.      This document complies with the word limit set forth in DDD Civ. P.S. III(A)(1) because, excluding parts of the document exempted under the practice standards, this document contains 8,839 words.

2.      This document complies with the typeface and type-style requirements set forth in DDD Civ. P.S. I(D) because this document has been prepared in Microsoft Word using 12-point Times New Roman, a proportionally spaced, serif font typeface.

*/s/ Douglas N. Letter*
DOUGLAS N. LETTER

## CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2021, I caused the foregoing document to be filed via the CM/ECF system for the U.S. District Court for the District of Colorado, which will send notification of that filing to all counsel of record in this litigation.


*/s/ Douglas N. Letter*
DOUGLAS N. LETTER