**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:21-cv-00147

BRIANNA BUENTELLO,

    Plaintiff,

v.

LAUREN BOEBERT,

    Defendant.

**REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

1. **INTRODUCTION**

    It is important to note what Boebert does not dispute. There is no argument that Buentello's comments are not First Amendment-protected speech and petitioning. *See* [Doc. #27]; [Doc. #27-1]. Boebert does not dispute that that the nature of the @laurenboebert account is compatible with First Amendment expression, that it is a public forum for speech, or that it is open to every member of the public to interact within it. *Id.* Most tellingly, Boebert does not dispute that she controls the @laurenboebert account and blocked Buentello for criticizing Boebert's official actions. *Id.* In other words, Boebert does not dispute that she blocked Buentello because of her viewpoint. *Id.*

    Instead, Boebert's response largely argues that Buentello's claims must fail because Boebert considers @laurenboebert a personal account. However, Boebert misunderstands the law in this area and state action does not turn on Boebert's assessment of her own account. What matters, under well-established law, is whether Boebert uses the account "as a tool of governance." *Davison v. Randall*, 912 F.3d 666, 680 (4th Cir. 2019); *Knight First Amendment*

1

*Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 231, 236 (2d Cir. 2019) ("*Knight*"), *vacated on other grounds*, No. 20-197, 2021 U.S. LEXIS 1863 (Apr. 5, 2021).[1] Even the one outlier case that Boebert bases nearly her entire argument upon acknowledges that "[a] private account can turn into a governmental one if it becomes an organ of official business[.]" *Campbell v. Reisch*, 986 F.3d 822, 826 (8th Cir. 2021).

And, Boebert uses the @laurenboebert account as a tool of governance and an organ of official business. She uses it to inform her constituents (and the public at-large) about her official stance, as a United States Representative, on: (1) legislation,[2] (2) the federal budget,[3] (3) federal

---

[1] The *Knight* decision was vacated on mootness grounds by the Supreme Court, however the Second Circuit's holding regarding state action remains persuasive authority. *See Benavides v. Jackson Natl. Life Ins. Co.*, 820 F. Supp. 1284, 1289 (D. Colo. 1993) ("Their precedential value can be diminished by an appellate court's vacation, but [opinions] can never be erased and their reasoning may continue to be followed."); *Jackson v. Ga. Dept. of Transp.*, 16 F.3d 1573, 1578 n. 7 (11th Cir. 1994) ("Although the opinion was vacated on unrelated grounds and is not binding precedent, its reasoning does have persuasive value.") (cleaned up); *U.S. v. Barona*, 56 F.3d 1087, 1092 n. 1 (9th Cir. 1995); *Natl. Black Police Assn. v. Dist. of Columbia*, 108 F.3d 346, 354 (D.C. Cir. 1997); *Mattei v. Mattei*, 126 F.3d 794, 801 n. 6 (6th Cir. 1997).

[2] *See e.g.,* Lauren Boebert (@laurenboebert), TWITTER, (April 1, 2021), https://twitter.com/laurenboebert/status/1377656693358743558 ("What's in Biden's 'infrastructure' plan? Massive subsides for wind, solar, electric vehicles and other Green New Deal mandates. $85 billion for mass transit, $213 billion for 'energy-efficient' housing, $35 billion for climate change, $25 billion for racial and gender inequities. Only 5.11% of $2.25 trillion goes to bridges, highways, roads and main streets in critical need of repair. This massive expansion of government control and the federal bureaucracy raises taxes to squander trillions on a liberal wishlist we can't afford."); Lauren Boebert (@laurenboebert), TWITTER, (March 30, 2021), https://twitter.com/laurenboebert/status/1376898297831510023 ("This week Biden is expected to unveil a $3.5 TRILLION dollar tax hike. The middle class, without a doubt, is going to bear the burden of these job-killing tax increases. I guess massive tax hikes are his version of promises made, promises kept."); Lauren Boebert (@laurenboebert), TWITTER, (March 25, 2021), https://twitter.com/laurenboebert/status/1375074519803645954; Lauren Boebert (@laurenboebert), TWITTER, (March 11, 2021), https://twitter.com/laurenboebert/status/1370135724637483012.

[3] *See, e.g.,* Lauren Boebert (@laurenboebert), TWITTER, (March 21, 2021), https://twitter.com/laurenboebert/status/1373637809899196422 ("How about instead of simply reusing the same budget every year and just increasing the money spent on everything we start at zero and see what we actually need?")

government programs[4], (4) international organizations,[5] (5) her legislative agenda,[6] (6) hot-button political issues in the context her role as a U.S. Representative,[7] (7) foreign policy,[8] and (8) her political opponents.[9] She uses the account to announce her introduction of legislation.[10]

---

[4] *See, e.g.,* Lauren Boebert (@laurenboebert), TWITTER, (March 31, 2021), https://twitter.com/laurenboebert/status/1377348206875406337 ("The American people should be downright insulted that Joe Biden and his cronies want to use OUR tax dollars helping illegal immigrants from other countries come here. The CAM program literally pays for flights. Now we're paying for border hotels."); Lauren Boebert (@laurenboebert), TWITTER, (March 20, 2021), https://twitter.com/laurenboebert/status/1373369128589869056.

[5] *See, e.g.,* Lauren Boebert (@laurenboebert), TWITTER, (March 31, 2021), https://twitter.com/laurenboebert/status/1377316318970572804 ("WHO reports on COVID should come with 'paid for by' disclaimers like campaign commercials. Should be easy for them considering its mostly CCP propaganda and falsified documents. We need to hold the WHO and CCP accountable for their blatant lies and disinformation.")

[6] *See, e.g.,* Lauren Boebert (@laurenboebert), TWITTER, (March 31, 2021), https://twitter.com/laurenboebert/status/1377285179279032326 ("The former President of the United States is TOTALLY BANNED, even from so much as speaking in the form of an interview, from Facebook and Instagram. These are two of the world's BIGGEST platforms. It's time to deal with big tech censorship."); Lauren Boebert (@laurenboebert), TWITTER, (March 11, 2021) https://twitter.com/laurenboebert/status/1370147271208095744.

[7] *See, e.g.,* Lauren Boebert (@laurenboebert), TWITTER, (March 31, 2021), https://twitter.com/laurenboebert/status/1377261316998578192; Lauren Boebert (@laurenboebert), TWITTER, (March 30, 2021), https://twitter.com/laurenboebert/status/1377021230688182272; Lauren Boebert (@laurenboebert), TWITTER, (March 30, 2021), https://twitter.com/laurenboebert/status/1376867169988980738.

[8] *See, e.g.,* Lauren Boebert (@laurenboebert), TWITTER, (March 19, 2021), https://twitter.com/laurenboebert/status/1372885379376906246 ("Vladimir Putin is basically calling Biden a senile old man, China rebuffed Anthony Blinken to his face & Kim Jong Un refuses to talk to anyone from the Biden regime... but it's good to know that America is ReSpEcTeD AgAiN.")

[9] *See, e.g.,* Lauren Boebert (@laurenboebert), TWITTER, (March 30, 2021), https://twitter.com/laurenboebert/status/1376906849476349956 ("Has Kamala Harris yet explained why she started hysterically cackling when discussing children not being able to return to school?"); Lauren Boebert (@laurenboebert), TWITTER, https://twitter.com/laurenboebert/status/1376166008898064385, (March 28, 2021).

[10] *See, e.g.,* Lauren Boebert (@laurenboebert), TWITTER, (March 27, 2021), https://twitter.com/laurenboebert/status/1375859621341102090 ("Yesterday, I introduced a Bill declaring ANTIFA a domestic terrorist organization. Even the Obama administration classified ANTIFA efforts as 'domestic terrorist violence.' Now the Biden administration is pretending that ANTIFA is a myth. It's time to hold ANTIFA accountable."); Lauren Boebert (@laurenboebert), TWITTER, (February 9, 2021),

Boebert also uses the account to document her official visits with constituents.[11] She "likes" replies to her tweets from her followers to indicate her approval of their responses, along with "liking" tweets from other accounts for the same purpose.[12] And, she uses the account to promote her appearances in the media in her official capacity as a U.S. Representative.[13] Boebert regularly posts during work hours on the @laurenboebert account. *See generally* Lauren Boebert (@laurenboebert), TWITTER, https://twitter.com/laurenboebert/with_replies.

Importantly, Boebert is not using @laurenboebert to post about her personal life. *Id.* It is not filled with pictures of her family and friends, backyard barbeques, or her restaurant. *Id.* She is using it to talk policy and announce her official actions as a United States Representative. *Id.*

Because it is clear that Boebert uses the @laurenboebert account as a tool of governance, Boebert's blocking of Buentello from the @laurenboebert account was state action and, consequently, violates the First Amendment and Colorado Constitution. Given that Buentello has demonstrated a likelihood of success that Boebert violated her constitutional rights, granting her request for a preliminary injunction is appropriate. *See Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806-07 (10th Cir. 2019).

2. **ARGUMENT**

---

https://twitter.com/laurenboebert/status/1359199784108756999?s=20 ("Last week I introduced a bill to end Joe Biden's ban on oil and gas leasing on federal lands and waters. The people of my district need these jobs and Joe's policies will hurt them directly!").
[11] *See, e.g.,* Lauren Boebert (@laurenboebert), TWITTER, (March 15, 2021), https://twitter.com/laurenboebert/status/1371657280857444362 ("Great to visit with so many patriots in Montrose. So proud to be your Representative!")
[12] Lauren Boebert (@laurenboebert), TWITTER, https://twitter.com/laurenboebert/likes.
[13] *See, e.g.,* Lauren Boebert (@laurenboebert), TWITTER, (March 29, 2021), https://twitter.com/laurenboebert/status/1376524245166067716; Lauren Boebert (@laurenboebert), TWITTER, (March 23, 2021), https://twitter.com/laurenboebert/status/1374531838170042368; Lauren Boebert (@laurenboebert), TWITTER, (March 18, 2021), https://twitter.com/newsmax/status/1372681200742113284.

4

## 2.1 **Boebert's blocking of Boebert constituted state action.**

The Supreme Court has repeatedly emphasized that the question of whether an act is "fairly attributable" to the government is a "necessarily fact-bound" inquiry that requires consideration of the circumstances in which the act took place. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295-96 (2001); *West v. Atkins*, 487 U.S. 42, 49 (1988). Observing that "what is fairly attributable is a matter of normative judgment, and [that] the criteria lack[s] rigid simplicity," the Court has charged the lower courts with determining whether state action exists by assessing whether there is a sufficiently "close nexus between the [government] and the challenged action." *Brentwood*, 531 U.S. at 295-96 (cleaned up).

This Court should resolve whether Boebert's blocking of Boebert constituted state action using the same framework employed by the Second and Fourth Circuits in analogous social media blocking cases,[14] which district courts have uniformly applied in cases like this one. *See Garnier v. Poway Unified Sch. Dist.*, No. 17-CV-2215-W (JLB), 2019 U.S. Dist. LEXIS 167247m 2019 WL 4736208, at *1 (S.D. Cal. Sept. 26, 2019); *Lewis v. Jones*, 440 F. Supp. 3d 1123 (E.D. Cal. 2020); *Windom v. Harshbarger*, 396 F. Supp. 3d 675, 681-683 (N.D. W. Va. June 6, 2019); *Felts v. Reed*, No. 4:20-CV-00821 JAR, 2020 U.S. Dist. LEXIS 224489, at *16-17 (E.D. Mo. Dec. 1, 2020); *One Wis. Now. v. Kremer*, 354 F. Supp. 3d 951 (W.D. Wis. 2019); *Am. Atheists v. Rapert*, 2019 U.S. Dist. LEXIS 230493, *37-58 (E.D. Ark. September 30, 2019).

That framework involves a straightforward application of Supreme Court precedent and calls for a fact-intensive, case-by-case analysis that recognizes that public officials may maintain their own personal social media accounts free from constitutional scrutiny—provided they do not use them as extensions of their office. Thus, to answer the state action question in a social media

---

[14] *Davison*, 912 F.3d at 680; *Knight*, 928 F.3d at 236.

blocking case such as this, the Court should examine the totality of the circumstances surrounding the account, including, for example, whether the account is used to inform constituents of activities related to the office, promote official events, and converse with constituents; whether the account includes markers of official status, such as references to the official's title or photographs of the official engaged in official conduct (*e.g.* delivering official addresses, meeting with other officials, or attending official events); and the context in which the constitutional violation happened (*i.e.* was the blocking in response to speech relating to official actions). When analyzing the @laurenboebert account under this framework, it is clear that Boebert's blocking of Buentello constitutes state action. Every argument advanced by Boebert that her blocking was not state action has been rejected by at least one court, and often times multiple courts, in the context of social-media-blocking cases.

### 2.1.1 **Under the consensus of authority relating to public officials' social media pages, the @laurenboebert account is a public forum and Boebert's blocking of Buentello is state action.**

Boebert's primary argument, which underlies nearly her entire response, is that the @laurenboebert account is a personal social media account, and that, accordingly, Boebert's decision to block Buentello from the account could not have involved state action. However, when a public official clothes a social media page, even a social media page created prior to the official's ascension into public office that the official considers a personal or campaign-related page, in the power and prestige of her public office, and operates the page to perform actual or apparent duties of her office, she acts under color of law. *See Knight*, 928 F.3d at 226; *Davison*, 912 F.3d at 681; *Garnier*, 2019 WL 4736208; *Windom*, 396 F. Supp. 3d at 681; *Felts*, 2020 U.S. Dist. LEXIS 224489; *Lewis*, 440 F. Supp. 3d at 1123; *Am. Atheists*, 2019 U.S. Dist. LEXIS 230493; *One Wis. Now*, 354 F. Supp. 3d at 951.

6

Most importantly, court after court has rejected every single argument Boebert raises regarding state action, in cases examining the actions of public officials with respect to social media pages that are substantially similar, and used in substantially similar ways, to the @laurenboebert account. A review of the below-outlined precedent in this area of law reveals that Boebert's state action arguments must fail.

For example, in the leading case on this topic, *Knight*, plaintiffs brought a claim after President Trump blocked them from his public Twitter account because they criticized him and/or his policies. 928 F.3d at 226. The court concluded that President Trump acted in a governmental capacity, not as a private citizen, in blocking users. *Id.* at 234-236. The court noted that the Twitter account bore "all the trapping of an official state-run account" because the President used his official title on the account and posted photographs of himself engaged in official duties, such as signing executive orders and delivering remarks. *Id.* at 231. The court also emphasized that the President used the account on "almost a daily basis as a channel for communicating with the public about his administration." *Id.* For example, President Trump used the account to announce matters of official government business. *Id.* at 235-36.

In *Davison*, the Fourth Circuit affirmed a finding that the Chair of a County Board of Supervisors ("the Chair") acted under color of state law in blocking plaintiff from her Facebook page. 912 F.3d at 681. The Chair argued that the First Amendment did not apply to the Facebook page because she opened the account on her own, and that it was therefore a purely "personal" account. *Id.* at 672–73. Rejecting the Chair's argument that state action was absent simply because the county government did not own the Facebook page, the court noted that the Chair had used the page as a "tool of governance"—that is, to provide the public with information about her and the board's activities, as well as to "solicit input" from the public on policy issues

7

and publicize trips she had taken in furtherance of county business. *Id*. at 679–80. The court also observed that the Chair "swathed the [page] in the trappings of her office" by, for example, including her official title on the page's header and addressing many of her posts to county residents. *Id*. at 680–81. Therefore, despite there being a "few" posts addressing topics less closely related to her official duties, the court affirmed the finding that the Chair's blocking of plaintiff was state action. *Id.* at 674, 681.

In *Garnier*, the defendants were members of a school board who created public Facebook pages to help promote their campaigns. 2019 WL 4736208, at *1. In determining whether the defendants acted under color of state law in blocking plaintiffs from that page, the court noted that defendants changed their pages to reflect their board positions after winning the elections and identified themselves by their official titles. *Id.* at *7. The court also mentioned that defendants used their pages to provide information about their school board activities and other school board information, such as linking to an online synopsis of a school board meeting and providing notice about board meetings and subjects to be discussed. *Id.* Finally, the court stated that just as in *Davison*, defendants' posts were linked to events that arose out of their official status as school board members. *Id.* The court found that defendants acted under color of state law because "[t]he content of [the defendants'] posts, considered in totality, went beyond their policy preferences or information about their campaigns for reelection . . . and bore a sufficiently close nexus with the state." *Id.*

In *Lewis*, the court granted a preliminary injunction to plaintiffs who had been blocked and their posts deleted from a sheriff's Facebook page. 440 F. Supp. 3d at 1123. The sheriff argued that he created the page as a tool for his campaign, and emphasized that he labeled himself a "Public Figure" on the page rather than a "Government Official." *Id.* at 1133. Although

8

the sheriff posted about holidays and personal updates about himself and his family, he also included his official title on the page and posted about events related to his role as sheriff. *Id.* at 1134.

In *Windom*, the court considered whether a plaintiff plead that a legislator acted under color of state law when he blocked the plaintiff from his Facebook page and deleted his comments. 396 F.Supp.3d at 681-683. In denying the official's motion to dismiss, and determining that the official had acted under color of law, the Court noted that: (1) the legislator's page "reflected the elected official's position"; (2) the legislator "used the account to engage with his constituents, followers and the public"; (3) the legislator "encouraged, solicited and allowed public comments between him and his constituents"; (4) that his page was "an important source of information about legislation"; (5) that the page "encouraged, solicited and allowed public comments between him and his constituents"; and (6) "a significant amount of speech posted on Delegate Harshbarger's page is by, to or about the government, specifically the West Virginia House of Delegates." *Id.* at 682-83. The Court held that the government official had acted under color of law despite the fact that: (1) he characterized his page as being made by him in his capacity as a politician (and not a government official); (2) the page listed the government official's private phone number, email address, and website; and (3) there was no indication that the legislator's posts were meant to be communications from the legislature as a whole. *Id.*

In *Felts*, the court held that the plaintiff had adequately alleged that a municipal alderman acted under color of state law in blocking a constituent from his Twitter account. 2020 U.S. Dist. LEXIS 224489, at *16-17. The court held that because the plaintiff had alleged that the alderman's Twitter account was "clothed in the power and prestige of his office" because "the

9

account's name, biography, and image reference[d]" the alderman's position and the alderman used his "account to perform duties related to his office, including informing his constituents of legislative developments and community events and critical public health/safety updates." *Id.*

In *One Wis. Now.*, the court determined that multiple legislators' blocking of the plaintiff from their Twitter accounts constituted state action. 354 F. Supp. 3d. at 951. Most analogously to this case, one legislator maintained an allegedly personal Twitter account that he created prior to ascending to public office and did not link to his official website or contact information, which was separate and apart from another account the legislator maintained that he considered his official Twitter account. *Id.* at 948. Nevertheless, the court held that the legislator's action in blocking the plaintiff from his allegedly "personal" Twitter account constituted state action. *Id.* at 952. It did so because the legislator used the allegedly personal account for "public purposes" including to post "tweets about policy… to constituents." *Id.* And, the court held that the legislator acted as a state actor because his allegedly personal Twitter account because he used the account "to perform actual and apparent duties as state assemblyperson using the power and prestige of that office to communicate legislative matters and other issues with the public." *Id.* at 953. The court found that the legislator's blocking was state action despite the fact that "(1) creating the Twitter accounts was not one of the [legislator's] enumerated duties; (2) the Twitter page will not become state property when the [legislator] leave office; and (3) some of the [legislator's] social media activity likely takes place outside of normal working hours." *Id.* at 951.

In *Am. Atheists*, the court determined that a state legislator acted under color of state law in blocking a constituent on one of his social media pages. 2019 U.S. Dist. LEXIS 230493, at *37-58. The legislator contended that "his actions on social media were not committed under

10

color of state law" because he considered his account to be a personal account, "the website included on his social media accounts [was his] campaign website," he used "his social media accounts for other business ventures," he maintained the accounts himself (and did not use government resources or staff to do so) and he posted on his page about "personal topics." *Id.* at *37. Further, the legislator argued that his blocking was not state action because his social media profiles did "not list his official, government contact information" and that "he discusse[d] a variety of personal matters on his page that are not related to his office." *Id.* at *43-44. The accounts also used his name, and not his office, in their handle. *Id.* The court rejected these arguments and held the legislator's blocking was state action because the accounts described the legislator as a state senator, the legislator discussed both national and local politics on the account, and the legislator regularly posted on the account during work hours. *Id.*, at *45-46, 51.

In this case, like the defendants in *Garnier* and *Lewis*, Boebert argues she created the @laurenboebert account as a tool for her campaign. And, like in *One Wis. Now* and *Am. Atheists*, Boebert also repeatedly emphasizes that she considers the account a personal account. However, Boebert "cannot escape h[er] role as a government official simply by calling" the @laurenboert account a personal or campaign account. *Lewis*, 440 F. Supp. 3d at 1134. Like President Trump in *Knight* and the Chair in *Davison*, the @laurenboebert account bears "all the trappings" of her office. For example, the @laurenboebert account explicitly says the account is that of the United States Representative for Colorado's Third District. [Doc. #2-1], p. 2.[15] She has a blue check

---

[15] Boebert argues that her account is a campaign account. At the time of the filing of this lawsuit there was no indication, in the description of the @laurenboebert account that it was a campaign page. *See* [Doc. #2-1] (showing Boebert describing the @laurenboebert account as the account for the "Congressman for CO-03" as of the filing of this lawsuit). After the filing of this lawsuit Boebert changed the description of the @laurenboebert account. Clearly, this was a tactical decision by Boebert and her counsel to alter the account in response to Buentello's lawsuit.

11

mark that verifies it is her official account. *Id.* Her profile picture appears to show her in her office. *Id.* And, she posts photographs of her performing official actions. *Id.*

Boebert also uses the @laurenboebert account much like the defendants in *Knight, Davison*, *Lewis, Garnier*, *Felts*, *Windom*, *One Wisc. Now*, and *Am. Atheists*. As outlined above, the @laurenboebert account informs Boebert's constituents about her actions as a United States Representative, future legislative agenda, official visits with constituents, her appearances in the media in her official capacity as a U.S. Representative. *See generally* Lauren Boebert (@laurenboebert), TWITTER, https://twitter.com/laurenboebert. She is using the account as a tool of her office, not to to post about her personal life. *Id.*

Boebert's attempts to distinguish her use of her Twitter account from President Trump's in *Knight* or from the Chair's use of her Facebook page in *Davison* are likewise unavailing. The Chair used her Facebook page to "provide information to the public about her and the Loudoun Board's official activities and [to] solicit input from the public on policy issues she and the Loudoun Board confront." *Davison*, 912 F.3d at 680. President Trump used his Twitter account "as a channel for communicating and interacting with the public about his administration." Knight, 928 F.3d at 235. Similarly, Boebert uses her Twitter account to provide information to the public about her official activities from her introduction of legislation to her vote on bills to her legislative agenda. She uses her Twitter account to engage in dialogue with other legislators, constituents, and journalists about the conduct of her office and the legislation she voted on. \

Boebert's arguments ignore the uncontestable facts demonstrating that Boebert intended to open a forum for speech by the public at large, not a one-way communications channel. Twitter is not just a media platform but a social media platform, labeled social because it facilitates overlapping conversations among and across groups of users. Indeed, the defining

feature of Twitter is its facilitation of real-time interaction. *See Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017) (observing that social media platforms like Twitter offer "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard," in part because these platforms permit citizens to "engage with [their elected representatives] in a direct manner"). Thus, it is significant that Boebert has chosen to use a Twitter account to communicate with the public about matters relating to her public officer rather than, for example, a blog, a radio station, or a webpage collecting press releases.

Further, the mere fact that a legislator uses a social media account to tout her accomplishments and encourage people to vote for her in the future does not automatically render state action absent—just as a city councilor's enumeration of his legislative achievements does not by itself convert an open public meeting into a private campaign rally. While in some cases an official may operate an account in a way that is akin to a campaign rally for the official's political supporters, the mere fact that the legislator engages in some campaign-related speech on the account cannot be sufficient to render the state action doctrine inapplicable. *Garnier*, 2019 WL 4736208, at *7; *Lewis,* 440 F. Supp. 3d at 1133-34; *Windom,* 396 F. Supp. 3d at 682-83; *One Wis. Now.* 354 F. Supp. 3d. at 953; *Am. Atheists*, 2019 U.S. Dist. LEXIS 230493, at *45-46, 51.

Moreover, to the extent that Boebert suggests that she acts under color of law only when she is specifically authorized by the laws and rules of Congress, she mischaracterizes the law. An official's conduct need not be authorized by a specific law for it to constitute action under color of law. *See One Wisconsin* Now, 354 F. Supp. 3d at 950 ("The law does not and has never required that a state action be specifically authorized by statute before being subject to

13

examination."). A contrary interpretation of the under color of law requirement would be "unworkable, narrow, and, simply put, silly." *Id.*

Simply put, if a public official chooses to use a social media account to gather information, register views, and communicate with the public as a means of carrying out her public duties, those actions will support a finding of state action. That is what the @laurenboebert account does. And, it is why Boebert's action in blocking Buentello was state action.

### 2.1.2 The context in which Boebert blocked Buentello further demonstrates state action.

The Supreme Court's "necessarily factbound" state action doctrine requires the court to consider the context in which the allegedly injurious act occurred. *See, e.g., West*, 487 U.S. at 55-56; *Brentwood*, 531 U.S. at 298. In accordance with this doctrine, focusing on the specific blocking of Buentello confirms the conclusion that there is a "close nexus" between Boebert's official status and Buentello's constitutional injuries. Multiple courts have held that an official acts under color of law when she blocks a constituent from such a social media page in response to the constituent's criticism of her official conduct or fitness for public office, which is exactly what happened in this case. *See Davison*, 912 F.3d at 680-81; *Lewis*, 440 F. Supp. 3d at 1134.

Boebert does not dispute that Buentello was blocked after responding critically to tweets by Boebert about her official actions: specifically, Boebert's vote against certifying the presidential election results (and not to tweets about personal pursuits, such as campaigning or fundraising). [Doc. #2-1], pp. 8-10. Indeed, the tweets giving rise to this suit were never even tweeted from her so-called "official" account and she only informed her constituents about her vote from the @laurenboebert account. *Compare* Lauren Boebert (@laurenboebert), TWITTER, (January 6, 2021), https://twitter.com/laurenboebert/status/1346871355453334785 *with* Lauren

14

Boebert (@RepBoebert), TWITTER, https://twitter.com/RepBoebert. The context of Boebert's blocking of Buentello itself supports a finding that the blocking was state action.

### 2.2 **Buentello has standing to bring this action.**

Boebert's assertion that Buentello lacks standing because of the absence of state action is simply a restatement of her other, failed, arguments. This Court has jurisdiction over Buentello's claim for prospective relief because Boebert continues to censor her by denying access to a public forum on the basis of her viewpoint (and Boebert does not dispute that she continues to block Buentello from her Twitter page). Boebert's violation of Buentello's First Amendment rights "'unquestionably constitutes [an] irreparable injury'" that this Court may remedy. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Courts faced with similar claims relating to elected officials' viewpoint-based blocking of comments have recognized that prospective relief is appropriate. *Davison*, 912 F.3d at 679; *Knight*, 928 F.3d at 226; *One Wisconsin Now*, 2019 WL 2162231.

### 2.3 **Boebert's blocking of Buentello was not government speech.**

Boebert claims that, even if her blocking of Buentello was under color of state law, the blocking of Buentello was actually, also, government speech. However, the government speech doctrine only applies to speech (1) that has "long been used ... to convey state messages"; (2) that is "closely identified in the public mind" with the government; and (3) where the state "maintains direct control over the message[]." *Matal v. Tarn*, 137 S. Ct. 1744, 1760 (2017) (cleaned up). Although Boebert's own tweets constitute government speech, the same cannot be said of speech in the interactive space of the tweets (i.e. the comment threads), which do not satisfy any of the requirements of the government speech doctrine. *Knight*, 302 F. Supp. 3d at 570; *Davison*, 912 F.3d at 686; *Windom*, 396 F. Supp. 3d at 683; *One Wisconsin Now*, 354 F. Supp. 3d at 944.

The argument Boebert advances here would turn the public forum doctrine on its head. A government official may be expressing a viewpoint by barring a critic from a town hall or city council meeting, but this does not mean that the act is properly characterized as government speech. If the space is a public forum, the First Amendment protects the right of the critic to criticize.

### 2.4 **Boebert's blocking of Buentello violated her free speech rights under the Colorado Constitution.**

The Colorado Supreme Court has stated that the Colorado Constitution "guarantees greater protections of . . . rights of speech than is guaranteed by the First Amendment." *Bock v. Westminster Mall Co.*, 819 P.2d 55, 58 (Colo. 1991). The Court did so consistent with the Supreme Court of the United States' decision in *also PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980), wherein the Court "explicitly acknowledged each State's 'sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution.'" *Bock*, 819 P.2d at 59 (quoting *PruneYard Shopping Center*, 447 U.S. at 81). In *Bock*, the Colorado Supreme Court considered the free speech rights of individuals under the Colorado Constitution who were speaking on private property: the common areas of the Westminster Mall. *Id.* In holding that barring petition gatherers from the Mall violated the Colorado constitution, the Court in *Bock* also found that "a highly visible government presence" weighs in favor of a so-called private building having to abide by the free speech rights of the public. *Id.* at 62. And, importantly, the court determined since there has been "no showing that petitioners' activities will adversely affect the Mall's business operations" and that the content of the plaintiffs' speech was "classically political" that restricting their speech violated the Colorado constitution. *Id.* at 62-63.

As outlined above, Boebert's @laurenboebert account is effectively providing a government service (in that it is being used to inform her constituents about her official government actions), certainly has a highly visible government presence (in that it is swathed in the trappings of her office), and there is no argument that Buentello's speech interfered with the operation of the @laurenboebert account or that it was anything but classically political.

Finally, "a federal officer is not entitled to Supremacy Clause immunity unless, in the course of performing an act which he is authorized to do under federal law, the agent had an objectively reasonable and well-founded basis to believe that h[er] actions were necessary to fulfill h[er] duties." *Wyoming v. Livingston*, 443 F.3d 1211, 1222 (10th Cir. 2006). Boebert admits in her response that her actions in blocking Buentello were not necessary to fulfill her duties as a United States Representative. Therefore, by blocking Buentello from the @laurenboebert account, Boebert is liable for the violation of Buentello's Colorado constitutional free speech rights as well.

7. **Conclusion**

Buentello respectfully requests that this Court grant her Motion for Preliminary Injunction, require that Boebert unblock her from the @laurenboebert account, and enjoin Boebert from blocking her in the future.

DATED this 16th day of April 2021.

                                                                 KILLMER, LANE & NEWMAN, LLP

                                                                 *s/ Andy McNulty*
                                                                 David A. Lane
                                                                 Andy McNulty
                                                                 1543 Champa Street, Suite 400
                                                                 Denver, CO 80202
                                                                 (303) 571-1000
                                                                 dlane@kln-law.com
                                                                 amcnulty@kln-law.com

This document complies with the word limit set forth in DDD Civ. P.S. III(A)(1) and the Order issued on April 6, 2021 [Doc. 28] because, excluding parts of the document exempted under the practice standards, this document contains 5,476 words.

## **CERTIFICATE OF SERVICE**

        I certify that on this 16th day of April 2021 I filed a true and correct copy of the foregoing via CM/ECF with the Court which will generate e-mailed notice to the following:

Douglas N. Letter
Brooks Hanner
Todd B. Tatelman
Office of General Counsel
US House of Representatives
5140 O'Neill House Office Building
Washington, DC 20515
202-225-9700
Douglas.letter@mail.house.gov
Brooks.hanner@mail.house.gov
Todd.tatleman@mail.house.gov
*Counsel for Defendant in her official capacity*

                                                     *s/ Jamie Akard*
                                                     Jamie Akard