**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Daniel D. Domenico**

Civil Action No. 1:21-cv-00147-DDD

BRIANNA BUENTELLO,

      Plaintiff,

v.

LAUREN BOEBERT, in her official capacity,

      Defendant.

---

**ORDER DENYING MOTION
FOR PRELIMINARY INJUNCTION**

---

Plaintiff Brianna Buentello alleges that United States Representative Lauren Boebert violated the First Amendment by blocking Ms. Buentello from her "@laurenboebert" Twitter account. Ms. Buentello asks the Court to order Representative Boebert to unblock her. Because Ms. Buentello has not met the high bar required for the extraordinary remedy of a preliminary injunction, the Court will not interfere in the operation of Representative Boebert's Twitter account.

## BACKGROUND

The material facts here are not in dispute.[1] Lauren Boebert, then a restauranteur in Rifle, Colorado, created a Twitter account with the handle @laurenboebert on December 8, 2019. The same day, she announced her candidacy for U.S. representative for Colorado's Third Congressional District. (Doc. 27-1 at ¶ 2.) Her campaign was successful, and she was declared the winner of the election on November 4, 2020. (*Id.* at ¶¶ 2, 8.) Before she assumed office in January 2021, the Committee on House Administration created a separate, official Twitter account for Ms. Boebert with the handle @RepBoebert. (*Id.* at ¶¶ 9–10.) She also continued to use her @laurenboebert account. Representative Boebert does not use government staff to operate the @laurenboebert account. (Doc. 27-1 at ¶¶ 1, 3, 18.)

On January 6, 2021, Ms. Buentello directed tweets at Representative Boebert, criticizing public remarks she made leading up to, during, and after the storming of the United States Capitol that occurred on that day. (*See* Doc. 1 at ¶¶ 51–55.) In at least one tweet, Ms. Buentello tagged

---

[1]   Ms. Buentello requested a hearing if Representative Boebert disputed the facts asserted in her motion and declaration. (Doc. 2 at p. 4 n.3.) Representative Boebert does not dispute the material facts alleged in the complaint, Ms. Buentello's motion, or her declaration, as Ms. Buentello appears to acknowledge on reply. (*See* Doc. 30 at pp. 1, 14.) Given that, the Court has decided the motion without a hearing. Federal Rule of Civil Procedure 65(a) does not require the Court to hold a hearing on a motion for a preliminary injunction, and whether to do so is within the Court's discretion. *Carbajal v. Warner*, 561 F. App'x 759, 764 (10th Cir. 2014); *see also Reynolds & Reynolds Co. v. Eaves*, 149 F.3d 1191, 1998 WL 339465, at *3 (10th Cir. 1998) (unpublished table decision) (no 10th Cir. authority requires court to hold evidentiary hearing prior to granting or denying preliminary injunction); Local Civ. R. 7.1(h) (motion may be decided without oral argument at court's discretion).

both Representative Boebert's @laurenboebert Twitter account and her official @RepBoebert House account. (Doc. 2-1 at ¶¶ 13–14.)

Representative Boebert then blocked Ms. Buentello's Twitter account from the @laurenboebert account. (Doc. 1 at ¶ 55.) While logged in to her blocked account, Ms. Buentello cannot view Representative Boebert's @laurenboebert Twitter feed, and she cannot directly participate in discussions or threads spawned from tweets made from the @laurenboebert account. (Doc. 2-1 at ¶ 16.) Ms. Buentello alleges that Representative Boebert blocked her because of Ms. Buentello's views on the storming of the U.S. Capitol and Representative Boebert's response. (*Id.* at ¶ 57.)

Representative Boebert did not block Ms. Buentello from the official @RepBoebert House account, and Ms. Buentello can fully view the @RepBoebert feed and participate in discussions created by that account's tweets. Since taking office, Representative Boebert has used her @laurenboebert account to discuss political issues, her legislative agenda, and bills she has introduced. (*See* Doc. 29 at pp. 2–4 (collecting tweets).)

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019). One may be granted "only when the movant's right to relief is clear and unequivocal." *McDonnell v. City & Cty. of Denver*, 878 F.3d 1247, 1257 (10th Cir. 2018). To prevail on her motion, Ms. Buentello must show: (1) that she is "substantially likely to succeed on the merits" of one or more of her claims; (2) that she will "suffer irreparable injury" if the court denies the injunction; (3) that her "threatened injury" without the injunction outweighs Ms. Boebert's

under the injunction; and (4) that the injunction is not "adverse to the public interest." *Mrs. Fields*, 941 F.3d at 1232; *accord Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Injunctions that would change the status quo are disfavored and require the movant to meet an especially heightened burden. *Mrs. Fields*, 941 F.3d at 1232.

## ANALYSIS

Representative Boebert's opposition to the preliminary-injunction motion rests primarily on her contention that blocking Ms. Buentello's account from her @laurenboebert account was done in her personal capacity, not in her official capacity or by anyone on her congressional staff. Ms. Buentello initially sued Representative Boebert in both her official and individual capacities. (Doc. 1 at p. 1.) But she has since voluntarily dropped her individual-capacity claims. (Doc. 18.)

## I.  First Amendment Claim

### A.  Cause of Action

Ms. Buentello's official-capacity claim for violation of the First Amendment raises a fundamental question: What authority empowers a district court to enjoin the actions of a sitting member of Congress acting in her official capacity? Although 18 U.S.C. § 1331 grants this Court jurisdiction to hear claims arising under the Constitution, it is unclear what cause of action Ms. Buentello relies on as a basis to enjoin Representative Boebert from violating the Constitution. Ms. Buentello suggests that there exists an implied cause of action under the Constitution for equitable remedies. But Ms. Buentello cites no decision of any court enjoining a member of Congress in her official capacity; nor has the Court found any. The extent to which the Constitution implies a cause of action to enforce its provisions remains open. *See Douglas v. Indep.*

*Living Ctr. of S. Cal., Inc.*, 565 U.S. 606, 619 (2012) (Roberts, C.J., dissenting) (noting that it is unsettled "whether and when constitutional provisions as a general matter are directly enforceable"). Ms. Buentello's assumption that the Court may enjoin Representative Boebert merely by leaning on its general equitable powers runs counter to the axiom that "equity follows the law." *Id.* Article III "does not extend the judicial power to every violation of the constitution which may possibly take place." *Cohens v. Virginia*, 19 U.S. 264, 405 (1821). The law must instead provide a judicially cognizable right to relief for the violation. *See Collins v. Yellen*, No. 19-422, slip op. at 3 n.1 (U.S. June 23, 2021) (Thomas, J., concurring). That Congress provides aggrieved plaintiffs explicit causes of action to assert constitutional claims in other contexts,[2] but not in this context, suggests there is none.

The Court is particularly sensitive to this issue in this case because it involves the judiciary's ability to enjoin allegedly official actions of a member of the legislative branch. And, as the Supreme Court has warned, "When a party seeks to assert an implied cause of action under the Constitution, separation-of-powers principles should be central to the analysis." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017).

Representative Boebert nevertheless does not ask the Court to decide these questions. Instead, she relies on a more well-established doctrine to oppose the injunction: state action.

---

[2]   *See, e.g.*, 5 U.S.C. §§ 702, 706(2)(B) (providing cause of action to challenge agency actions alleged to be "contrary to constitutional right, power, privilege, or immunity").

### B. State Action

The First Amendment's protection of the People's right to free speech, like other rights protected by the Constitution, is implicated only when the government, not a private entity or individual, regulates speech. *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019). This precondition for a constitutional claim is known as the "state action" requirement. To succeed on her free-speech claim, therefore, Ms. Buentello must show that Representative Boebert's decision to block her from interacting with the @laurenboebert account was an act attributable to the state, not a private individual. "[C]areful adherence to the 'state action' requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 (1982).

To constitute state action, the alleged deprivation of a right "must be caused by the exercise of some right or privilege created by the State . . . or by a person for whom the State is responsible," and "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *West v. Atkins*, 487 U.S. 42, 49 (1988). The distinction between private and state action is a "fact-bound inquiry" that depends on whether there is "a close nexus between the State and the challenged action." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295, 298 (2001).

Both sides appear to agree that had Ms. Boebert blocked Ms. Buentello prior to taking office, or at least prior to winning her election, that would not have amounted to state action. Before then, Ms. Boebert clearly had no government title or authority. Ms. Buentello argues, however, that at some point after the election, at the latest when Ms. Boebert took office, the character of the @laurenboebert account

- 6 -

transformed from that of a private individual to a vehicle for official government business, such that blocking Ms. Buentello from commenting on the @laurenboebert account on January 6, 2021 constituted state action. But the unrebutted evidence shows that no government staff operate the @laurenboebert account.

### 1. Authority of Members of Congress to Act on Behalf of the State

Neither the Supreme Court nor the Tenth Circuit has yet analyzed state action in the context of social-media blocking. Lacking controlling precedent, Ms. Buentello cites out-of-circuit authority. One decision she relies on involved the chair of a county board who blocked and banned a constituent from participating on the "county Facebook page." *Davison v. Randall*, 912 F.3d 666, 673 (4th Cir. 2019), *as amended* (Jan. 9, 2019). There, the Fourth Circuit agreed with the district court's finding that the chairwoman was "acting under color of state law" pursuant to 42 U.S.C. § 1983. *Id.* at 679–81. The circuit and district court looked to things such as the title of the social-media page, the page's categorization on Facebook, the contact information listed on the page, and the content of the page's posts to determine whether a ban or block constituted state action. *Id.* at 678–81.

In another decision, the Second Circuit relied on similar factors to determine that former-President Donald Trump's blocking of a constituent on Twitter amounted to state action. *Knight First Amend. Inst. at Columbia Univ. v. Trump* (*Knight*), 928 F.3d 226, 234 (2d Cir. 2019), *cert. granted, judgment vacated as moot sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.* (*Knight II*), 141 S. Ct. 1220 (2021). The court noted that there was "substantial and pervasive government involvement with, and control over" the relevant Twitter account. *Id.* at 235. Factors favoring a finding of state action, according to the Second

Circuit, included: the account's reference to the official @POTUS account, the then-President's use of Twitter as a "tool of governance and executive outreach," his use of Twitter to engage with foreign officials, his use of Twitter to hire and fire staff, and his use of Twitter to announce changes to national policy. *Id.* at 235–36. The Second Circuit's decision was vacated by the Supreme Court, and so no longer has any legal effect, but the Court has taken it into account as at least a thoughtful, if now academic, approach to the question.

The Court nevertheless has doubts about whether the text of the Constitution supports a process of adding up the content of an official's social-media posts to determine whether some critical mass of state action has been reached that would make the entire operation of the account state action. These factors might tell us if an official is using an account for official business, but that seems far afield from answering the question of whether a member of Congress's blocking a Twitter follower meets the requirements for state action the Supreme Court laid out in *West*. That an account might be used for official purposes in one instance does not necessarily turn everything the account holder does into state action (just as, for example, a public official's use of a particular phone to take various official actions would not be determinative of whether *every* action taken on that phone amounted to state action). Perhaps with an official account of the type the House created for Representative Boebert, blocking a user might be considered "the exercise of some right or privilege created by the State." 487 U.S. at 49. But the same does not necessarily follow for an account created by an individual, which is what is at issue here. Nor can it be argued that in general "the State is responsible" for the actions of members of Congress. *Id.* (finding that State was responsible for doctor employed as contractor for state

prison). Members of Congress, acting as a group through the legislative process, are responsible for the actions of the state, not the reverse.

Ultimately, "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *West*, 487 U.S. at 54. What all these cases show is that it is not enough for the "actor" to be drawing a government paycheck, or even to be someone who has some authority to act on behalf of the state. The particular action in question must, to implicate the Constitution, be undertaken on behalf of the state.

Representative Boebert, or any member of Congress, has almost no power to act on behalf of the United States government. Her authorized powers, and those of her colleagues, are important, but few. She can participate in the election of the Speaker of the House and other House Officers. U.S. Const. art. I, § 2, cl. 5. She can propose bills (including the exclusive power, along with her fellow Representatives, to initiate revenue bills) and vote on bills. *See id.* art. I, § 7, cl. 7. She can vote on articles of impeachment of the President and other civil officers. *Id.* art. II, § 4. And she can vote for the President if a majority of the electoral college fails to elect a candidate. *Id.* amend. XII. Those are profound powers, and ultimately Congress as a whole is in control of the ship of state. But its individual members, unlike executive branch officials, generally do not have authority to act on behalf of the state.[3]

---

[3] Members of Congress do have some narrow powers under federal statute to act on behalf of the state. Representatives can, for example, hire and fire staff, 2 U.S.C. § 4101, and nominate candidates to the U.S. military academies, *see, e.g.*, 10 U.S.C. § 9442(a)(4) (governing nominations to United States Air Force Academy). These are the sorts of things that could qualify as state action under *West*. And the use of the House-created @RepBoebert account might be analogous. But that, of course, is not the account at issue here.

*Davison* and *Knight* both involved the accounts of executive-branch officials, limiting the applicability of those decisions here. Legislators' authority to act on behalf of the state is much more limited than that of executive-branch officials. *See Campbell v. Reisch*, 986 F.3d 822, 827 (8th Cir. 2021). The President, for example, acts on behalf of the government in any number of areas; indeed, that is the basic function of the executive. *See* U.S. Const. art. II; *Nixon v. Fitzgerald*, 457 U.S. 731, 749–50 (1982). The "official capacity" of a member of the executive branch is categorically dissimilar from the "official capacity" of a member of Congress—not just in degree, but in kind.[4]

Put simply, legislators legislate. Their state-created powers are to propose legislation and to vote—and little else. Blocking a Twitter user on an account created before she was elected to office is something Ms. Boebert could do before she was in office and could do after she leaves office. If the defendant's position in government makes no difference to her ability to take the action in question, it is hard to see how the action could be deemed to be one taken under authority created by the state or on its behalf. It is not a state-created right or privilege and therefore cannot constitute state action. Perhaps her ability to hire and fire staff might have been relevant to the extent Representative Boebert employed government staff to administer her @laurenboebert Twitter account. But the unrebutted evidence says she did not. (Doc. 27-1 at ¶¶ 1, 3, 18.) Given that, Ms. Buentello has not pointed to any state action involved in Representative Boebert's blocking of her on Twitter.

---

[4]   Those cases are further distinguishable because both defendants used government staff to operate the social-media pages in question. *Davison*, 912 F.3d at 673; *Knight*, 928 F.3d at 235.

The First Amendment states that "*Congress* shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. I (emphasis added). Congress, not its individual members, commands the federal government, and it is that body that the First Amendment sought to constrain. Individual legislators do not have the constitutional power to either make law or abridge speech, and thus their individual actions are not within the First Amendment's coverage. Even without the Supreme Court's admonishment to be particularly sensitive to separation-of-powers concerns in cases like this, *see Ziglar*, 137 S. Ct. at 1857, this fact would be enough to distinguish *Davison*, *Knight*, and the district-court decisions applying those cases.[5]

Ms. Buentello cites several decisions involving social-media blocking by state-level and municipal-level legislators. To the extent those cases simply apply the holdings in *Davison* and *Knight* to individual legislators, the Court finds them unpersuasive. Those decisions involving state rather than federal officials are also distinguishable because they were brought under 42 U.S.C. § 1983 and the Fourteenth Amendment rather than directly under the Bill of Rights. *See Lugar*, 457 U.S. at 935 n.18 (holding that constitutional state action under the Fourteenth Amendment necessarily constitutes action "under color of state law" for purposes of Section 1983, but not vice-versa); *Flagg Bros. v. Brooks*, 436

---

[5]    *See Texas v. Rettig*, 993 F.3d 408, 417 (5th Cir. 2021) (Ho, J., dissenting from denial of rehearing en banc) ("As judges, we have sworn an oath to uphold the Constitution. So if we are forced to choose between upholding the Constitution and extending precedent in direct conflict with the Constitution, the choice should be clear: Our duty is to apply the Constitution—not extend precedent." (brackets and internal quotation marks omitted)); *see also Edmo v. Corizon, Inc.*, 949 F.3d 489, 506 (9th Cir. 2020) (Bumatay, J., dissenting from denial of rehearing en banc) (arguing that lower courts have a "duty to interpret the Constitution in light of its text, structure, and original understanding" in absence of binding precedent).

U.S. 149 (1978) (noting that "under color of state law" and state-action analyses are "two separate areas of inquiry"). Several of the other legislator decisions that Ms. Buentello cites are distinguishable based on their procedural and factual posture. For instance, in *Windom v. Harshbarger*, 396 F. Supp. 3d 675, 685 (N.D. W. Va. 2019), the court weighed the *Davison* factors and concluded that those factors weighed against a finding of state action, but nevertheless found it "premature" to dismiss on a Rule 12(b)(6) motion. In *Felts v. Reed*, No. 4:20-CV-00821 JAR, 2020 WL 7041809, at *6 (E.D. Mo. Dec. 1, 2020), the court found only that the plaintiff stated a plausible claim that an alderman's social-media blocking constituted state action.

### 2. Representative Boebert's Use of @laurenboebert

Representative Boebert's use of her Twitter account is distinguishable in other ways from the challenged uses in the decisions cited by Ms. Buentello. The facts surrounding the @laurenboebert account are more akin to the situation analyzed in *Campbell v. Reisch*. In that Section 1983 case, the Eighth Circuit held that a state representative's blocking of a constituent on Twitter was not state action. 986 F.3d at 825. The court noted that the state representative mostly used the account for campaign purposes, as is the case here. *Id.* (finding that occasional "stray" post-election tweets relating to representative's official activities did not render the blocking state action). Ms. Buentello cites many of Representative Boebert's tweets, noting that they discuss political issues such as legislation, the federal budget, her legislative agenda, and, perhaps most frequently, her political opponents. (Doc. 29 at pp. 2–4.) But these are the same kinds of issues Ms. Boebert raised on the campaign trail—the same sorts of tweets found insufficient to transform a private account into a state account in *Reisch*. Unlike a president, who might be able to author tweets that have some legal effect (say,

when announcing an executive order via Twitter), Representative Boebert's tweets have not had any binding, legal effect—primarily because she is a legislator without the authority to unilaterally bind anyone. The record contains no evidence that she has announced changes in national policy or hired or fired staff via her account, for instance, as was the case in *Knight*.[6] So even under Ms. Buentello's proposed doctrinal framework, Representative Boebert's blocking does not satisfy the requirements of state action. The government does not authorize her to run this Twitter account, and her use of the account does not amount to action on the government's behalf.

Nor does Ms. Buentello's claim appear to implicate any Tenth Circuit caselaw developed to address when a litigant seeks to hold a private person accountable as a state actor. The Tenth Circuit has developed four tests for that situation: the "nexus test," the "public function test," the "joint action test," and the "symbiotic relationship test." *Wittner v. Banner Health*, 720 F.3d 770, 775 (10th Cir. 2013). The "nexus test" asks whether the state has exercised coercive power over a private actor's decision or action. *Id.* at 775–76. The "public function" test asks "whether the challenged action is a traditional and exclusive function of the state" and "is difficult to satisfy." *Id.* at 776–77. The "joint action test" asks whether a private actor acted in concert with state officials to deprive the plaintiff of constitutional rights. *Id.* at 777. And the

---

[6]   Of course, executive orders, altering national policy, and firing government employees are paradigmatic examples of state actions. This Court has doubts, though, that the *announcement* of those state actions is itself state action, and more to the point, that announcing them via a particular *medium* transforms all actions an official takes in connection with that medium into state action.

"symbiotic relationship" test asks whether there is "entwinement" between the state and a private entity. *Id.* at 777–78.

The facts of this case do not fit neatly into any of these four tests. For instance, the state has not exercised "coercive power" over Representative Boebert (nexus test); blocking someone on Twitter is not a traditional and exclusive function of the state (public-function test); and Representative Boebert did not act in concert with state officials (joint-action test). Perhaps the "entwinement" test is a better fit, but that doctrine appears to have been developed to address action by private entities engaged in business relationships with the state, such as contractors for correctional facilities. *See id.* at 777–80 (collecting cases under this test applied to entities with government contracts or that accept state funding).

Under the unrebutted facts before the Court, Ms. Buentello cannot demonstrate that Representative Boebert's use of the @laurenboebert

account constituted state action.[7] Ms. Buentello therefore has failed to meet her burden of establishing a substantial likelihood of success on the merits of her First Amendment claim.

## II. Colorado Constitutional Claim

Ms. Buentello also brings a claim under the Colorado Constitution's guarantee of freedom of speech and press. Colo. Const. art. II, § 10. That provision states, in relevant part, that "no law shall be passed impairing the freedom of speech; every person shall be free to speak, write or

---

[7] Even if she had established state action, to prevail on her First Amendment claim Ms. Buentello would also have to establish that @laurenboebert is a public forum. There are significant reasons to question whether that could be so. *See Knight II*, 141 S. Ct. at 1221–26 (Thomas, J., concurring). And concluding that elected officials' social-media accounts are public forums may cause more wide-ranging consequences than courts have acknowledged. At core, a public forum is, as Ms. Buentello points out, a place where everyone can engage in unfettered exchange of ideas, subject only to the liberal limits of the First Amendment. *See Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972). So if an official's Twitter account is truly a public forum, then everyone must be allowed to participate and speak out in that forum. But in fact, Twitter has the power to suspend or terminate any user's account "at any time for any or no reason," *see Knight II*, 141 S. Ct. at 1221–26 (Thomas, J., concurring), and has in fact exercised that power to block presidents, newspapers, and everyday citizens alike from speaking on its platform, including these alleged public forums. If public officials' accounts are true public forums, those exclusions too must be subject to First Amendment scrutiny. Government officials can't operate a public forum and yet permit its private host to block critics from that forum. So if a public official's Twitter feed is a public forum, then officials could be liable not only for their own blocking, as is alleged here, but also for choosing to hold a public forum on a platform that itself blocks or chills speech that, while it may violate the platform's terms of service, is protected by the Bill of Rights.

publish whatever he will on any subject, being responsible for all abuse of that liberty."[8] *Id.*

The Colorado Supreme Court has interpreted this provision to provide protection not only against government action but also "certain exercises of private power." *See Bock v. Westminster Mall Co.*, 819 P.2d 55, 59–60 (Colo. 1991). In *Bock*, the Colorado Supreme Court extended constitutional liability to a shopping mall that partnered with a city government to improve surrounding streets and allowed the city to operate a police substation within the mall rent-free. *Id.* at 61–62.

This, however, is not quite as significant a departure from federal First Amendment doctrine as Ms. Buentello argues—or needs it to be to prevail. This "exception" to the state-action requirement closely mirrors the federal courts' expansion of the state-action doctrine to include private entities acting on the government's behalf or otherwise intertwined with the government. *See Wittner*, 720 F.3d at 775–78. But as explained above, those doctrines appear to have little applicability to social-media-blocking cases where a single elected official commits the relevant act on her own initiative. Because Ms. Buentello has cited no other Colorado caselaw on state action that would alter the Court's analysis under the federal Constitution, she is unlikely to succeed on the merits of her state-law claim.

And if Ms. Buentello were right that operating @laurenboebert is a government-authorized activity, the Supremacy Clause would also seem to present a barrier to Ms. Buentello's state-law claim. A federal officer

---

[8]   Ms. Buentello's claim under the Colorado Constitution raises cause-of-action and separation-of-powers concerns similar to those raised by her federal claim. She has not provided any case where a federal court has enjoined a member of Congress, in her official capacity, for a violation of state law.

is entitled to Supremacy Clause immunity from state liability if, in performing an act "which he is authorized to do under federal law, the agent had an objectively reasonable and well-founded basis to believe that his actions were necessary to fulfill his duties." *Wyoming v. Livingston*, 443 F.3d 1211, 1222 (10th Cir. 2006). Ms. Buentello argues that Representative Boebert has conceded that her blocking of Ms. Buentello was not necessary to fulfill her duties as a United States Representative. But if her blocking was not part of her officially authorized duties, then it's hard to see how the blocking was state action. And if the claim would turn on whether this kind of Twitter activity is "necessary," this Court is deeply dubious, for the separation-of-powers reasons noted above, among others, that federal courts are the proper forum for second-guessing members of Congress as to what is a necessary part of their job. Either way, Ms. Buentello's state-law claim would fail.

Since Ms. Buentello has not shown she is likely to succeed on the merits of either of her claims, the Court need not address the other preliminary-injunction factors. Her request for a preliminary injunction is denied.

## CONCLUSION

Since she is not likely to succeed on the merits of either of her claims, Ms. Buentello's Motion for a Preliminary Injunction (Doc. 2) is DENIED.

DATED: June 24, 2021                    BY THE COURT:

Hon. Daniel D. Domenico
United States District Judge