IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Daniel D. Domenico

Civil Action No. 1:21-cv-00147-DDD

BRIANNA BUENTELLO,

     Plaintiff,

v.

LAUREN BOEBERT, in her official capacity,

     Defendant.

---

## ORDER GRANTING
## MOTION FOR SUMMARY JUDGMENT

---

The defendant in this case is a member of the United States House of Representatives. She operates two Twitter accounts. One, @laurenboebert, she created in 2019 prior to being elected and considers her personal account. The other, @RepBoebert, was created by the Committee on House Administration and turned over to Defendant's control in January 2021, when she assumed office as the Representative from Colorado's Third Congressional District. (Doc. 2 ¶¶ 9-10.)

As described in my prior order denying Plaintiff's motion for a preliminary injunction, on January 6, 2021, Plaintiff directed tweets at Defendant, criticizing public remarks Defendant made leading up to, during, and after the storming of the United States Capitol that occurred on that day. (*See* Doc. 1 ¶¶ 51-55.) Defendant then blocked Plaintiff's Twitter account from the @laurenboebert account. (*Id.* ¶ 55.) Having been blocked, Plaintiff cannot view Defendant's @laurenboebert Twitter feed (at least when logged into the blocked account), and she cannot participate in discussions or threads spawned from tweets made from

Defendant's @laurenboebert account. (Doc. 2-1 ¶ 16.) Defendant did not block Plaintiff from the @RepBoebert House account, and Plaintiff can fully view the @RepBoebert feed and participate in discussions originating from that account's tweets.

Plaintiff brought this case alleging that being blocked from @laurenboebert is a violation of her First Amendment rights. (Doc. 1.) I previously denied her motion for a preliminary injunction on the basis that she was unlikely to prevail on the merits. (Doc. 31.) Defendant has now moved for summary judgment, even though discovery has not commenced, arguing that Plaintiff's claims cannot proceed for a variety of legal reasons. (Doc. 34.)

Plaintiff originally declined to mount any response to the merits of those legal arguments, seeking instead to conduct discovery before discussing the questions presented by the summary-judgment motion. (Doc. 35.) Noting that many of Plaintiff's discovery requests appeared beyond the scope necessary to address the legal arguments presented by the motion, and that she had not presented any legal counterarguments at all, I gave Plaintiff another opportunity to brief her position. (Doc. 37.) She did, to an extent, and Defendant responded. (Docs. 38, 39.) Whether it is wise for members of the United States Congress to block critical constituents from their social-media accounts is not for a court to say. The only question here is whether federal courts are authorized to legally forbid one from doing so in these circumstances. Because I conclude they are not, Defendant's motion for summary judgment is granted.

## LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Adamson v. Multi Cmty. Diversified Servs.,*

*Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). A fact is material if it could affect the outcome of the suit under the governing law; a dispute of fact is genuine if a rational jury could find for the nonmoving party on the evidence presented. *Adamson*, 514 F.3d at 1145. If a reasonable juror could not return a verdict for the nonmoving party, summary judgment is proper, and there is no need for a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the moving party bears the burden of demonstrating no genuine issue of material fact exists. *Adamson*, 514 F.3d at 1145. In deciding whether the moving party has carried its burden, courts do not weigh the evidence, and instead must view it and draw all reasonable inferences from it in the light most favorable to the nonmoving party. *Id.*

## DISCUSSION

Plaintiff initially sought relief against Defendant in both her individual and official capacities and sought both monetary and injunctive relief. (Doc. 1 at 1, 29.) She has since dropped any claims against Defendant in her individual capacity and disclaimed any request for monetary relief. (Docs. 18, 38 at 1.) So the only remaining question is whether a federal court can direct Defendant, in her official capacity as a member of Congress, how to operate the @laurenboebert Twitter account.

Defendant contends the answer is no for a number of reasons, including lack of state action, lack of standing, lack of a cause of action, separation-of-powers concerns, and, upon my request for supplemental briefing, sovereign immunity. (Doc. 34 at 8-16; Doc. 39.) Plaintiff's main response is to seek discovery, which she says is necessary before a ruling can be made on the motion for summary judgment. (Docs. 35, 38.) But that is only so if the discovery she seeks is appropriate and if it might alter the outcome of the case.

Plaintiff's claims are barred by sovereign immunity and for lack of a judicially cognizable cause of action. And even if her claims are not barred, Defendant's act in blocking Plaintiff from the @laurenboebert Twitter account was not state action, and therefore not a First Amendment violation. These legal deficiencies doom Plaintiff's case, and Plaintiff has not identified any facts she might obtain through discovery that would cure these deficiencies or demonstrate a genuine factual dispute precluding summary judgment.

## I.   Jurisdiction and Other Threshold Issues

By dropping any claims against Defendant in her individual capacity or for retrospective monetary relief, Plaintiff has made it unnecessary to delve into all of the possible barriers to bringing suit against a member of Congress. But the remaining request to enjoin a member of Congress in her official capacity still raises a number of profound constitutional and structural issues that are not present in many of the cases Plaintiff cites that address whether and how various government actors may be liable for blocking social-media users.

### A.  Sovereign Immunity

The parties each contend the sovereign immunity question is simple. The general proposition is that "the United States retains its sovereign

immunity from suit unless it has expressly waived such immunity."[1] *Nat'l Commodity & Barter Ass'n v. Gibbs*, 886 F.2d 1240, 1245-46 (10th Cir. 1989). Application of this doctrine, moreover, "cannot be avoided simply by naming agencies of the federal government or their individual officers and employees." *Id.* (citing *Atkinson v. O'Neill*, 867 F.2d 589, 590 (10th Cir. 1989)). "[A]ny action that charges [a federal] official with wrongdoing while operating in his or her official capacity as a United States agent operates as a claim against the United States." *Farmer v. Perrill*, 275 F.3d 958, 963 (10th Cir. 2001). Because that is what Plaintiff claims here, Defendant says her suit is barred.

Plaintiff recognizes the general principle, but points to the "extremely important and well-established exception to the principle of sovereign immunity [that suits seeking injunctions] against government officers are not barred." (Doc. 38 at 1-2 (quoting Erwin Chemerinsky, *Federal Jurisdiction* § 9.2.2 (5th ed. 2007)).) Because *that* is now all that she seeks here, she says her suit is *not* barred. Defendant responds, however, that "[i]t is well established that the United States' sovereign immunity 'extends to (claims for) injunctive relief.'" (Doc. 39 at 1 (quoting *Rockefeller*, 234 F. App'x at 855).)

---

[1]   Plaintiff points to two statutes she says expressly waive sovereign immunity in this case: 5 U.S.C. § 702 (the Administrative Procedure Act) and 28 U.S.C. § 1361 (granting district courts jurisdiction over certain mandamus actions). (Doc. 38 at 2-3.) Neither of those, however, waives sovereign immunity for official-capacity suits against members of Congress. *Rockefeller v. Bingaman*, 234 F. App'x 852, 856 (10th Cir. 2007) ("Congress is not an 'agency' as defined under the Administrative Procedure Act." (quoting *Clark v. Library of Cong.*, 750 F.2d 89, 102 (D.C. Cir. 1984) (citing 5 U.S.C. § 701(b)(1)(A)))); *Wash. Legal Found. v. U.S. Sent'g Comm'n*, 89 F.3d 897, 901 (D.C. Cir. 1996) ("It is well settled that [Section 1361] does not by itself waive sovereign immunity." (collecting cases, including *McQueary v. Laird*, 449 F.2d 608, 611 (10th Cir. 1971))).

Reconciling all of these "well-established" or "well-settled" rules, it turns out, is not quite as simple as either party suggests. Plaintiff is right that generally claims for only specific relief, *i.e.*, injunctive or declaratory relief, against a federal officer who acted *ultra vires* or unconstitutionally are not barred by sovereign immunity. *See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682 (1949); *Dugan v. Rank*, 372 U.S. 609 (1963); *Wyoming*, 279 F.3d at 1225. But Defendant is also right that this is not an absolute rule, and the Tenth Circuit has explicitly "rejected arguments to the effect that the United States has no immunity when only injunctive relief is sought." *Rockefeller*, 234 F. App'x at 856 (cleaned up). So what types of claims might fall into the exception to the specific-relief exception to the general sovereign-immunity rule?

*Rockefeller* provides at least a hint. That case, like this, is one of the relatively few in which a plaintiff asked a court to enjoin a member of the United States Congress from action taken in his or her official capacity. And that raises a complication that is not accounted for in the parties' "well-established" precedents. *Rockefeller* notes that the Speech or Debate Clause immunizes members of Congress from liability for actions taken in the course of their legislative duties. The court in *Rockefeller* therefore found that the specific-relief exception to sovereign immunity was "not available" because "[i]n the context of a suit for injunctive relief against individual members of Congress," that exception "would in effect nullify the legislative immunity." *Id.*

It would be paradoxical, or at least ironic, to shield representatives under a clause meant to protect speech and debate from liability for allegedly using their power precisely to prevent another citizen's ability to engage in those very things. I do not agree with Defendant that the Speech or Debate Clause is applicable here even though Plaintiff now asserts claims against Defendant solely in her official capacity.

*See Hutchinson v. Proxmire*, 443 U.S. 111, 133 (1979) (congressman's speech or acts not part of "the legislative function or the deliberations that make up the legislative process" are "not protected by the Speech or Debate Clause"); *Doe v. McMillan*, 412 U.S. 306, 313 (1973) ("[E]verything a Member of Congress may regularly do is not a legislative act within the protection of the Speech of Debate Clause."). Use of Twitter, important as it is to many, seems well outside the legislative function and deliberative legislative process. The Clause does, though, highlight that the Constitution takes quite seriously the potential danger to the separation of powers that can be posed by allowing legislators to be haled into court before "a possibly hostile judiciary." *Gravel v. United States*, 408 U.S. 606, 617 (1972). And careful analysis of the case law governing the relationship between injunctive relief and sovereign immunity indicates a strong concern for legislative independence.

The exception to sovereign immunity for suits seeking specific relief from a federal official's *ultra vires* or unconstitutional conduct is generally traceable to *Ex Parte Young*, 209 U.S. 123 (1908), which established an exception to Eleventh Amendment immunity for suits seeking injunctive relief from state officials. *See, e.g.*, *Fla. Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 696-97 (1982) (*Larson*'s conclusion as to federal sovereign immunity "follows inevitably from *Ex parte Young*"); *Connecticut v. Cahill*, 217 F.3d 93, 100-01 (2d Cir. 2000) (*Young*'s core principles have been applied in cases involving claims against federal officers, including *Larson*). As the Supreme Court has recently made clear, this exception is rooted in longstanding historic practice, and that practice is expressly tied to *executive* overreach, not legislative. "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal *executive* action, tracing back to England." *Armstrong v.*

*Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (emphasis added); *see also id.* ("The power of federal courts of equity to enjoin unlawful e*xecutive* action is subject to express and implied statutory limitations." (emphasis added)); *Dalton v. Specter*, 511 U.S. 462, 472 (1994) (summarizing *Larson* as holding "that sovereign immunity would not shield an *executive* officer from suit if the officer acted either 'unconstitutionally *or* beyond his statutory powers'" (first emphasis added)). And as discussed below, the Supreme Court has even more recently made clear that federal courts must not use broadly worded pronouncements in prior cases to allow themselves to be entangled in areas where neither Congress nor longstanding history and tradition authorize it. *See Egbert v. Boule*, 142 S. Ct. 1793, 1809 (2022).

Further supporting the conclusion that the specific-relief exception set forth in *Young, Larson*, and their progeny is meant to apply to executive action, and that it should not be extended to official-capacity suits against officials of the other branches, is Congress's passage of the two statutes discussed above, *supra* n.1, which largely codify and simplify questions about the application of *Larson*. *See Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1230-36 (10th Cir. 2005); Chemerinsky, *supra*, § 9.2.2, at 634. The 1976 amendment to the Administrative Procedure Act waives sovereign immunity in suits requesting non-monetary relief from agencies of the federal government and officers and

employees thereof, and expressly excludes Congress and the federal courts from the definition of "agency."[2] 5 U.S.C. § 702; 5 U.S.C. § 701(b)(1)(A), (B).

Ultimately, neither the statutes nor the cases Plaintiff cites support the proposition that sovereign immunity has been waived or does not apply to suits seeking to enjoin the official conduct of members of Congress. And in fact, Plaintiff has not provided a single example of a federal court enjoining a U.S. representative or senator in his or her official capacity. Without a clear directive from Congress or the superior courts, I must conclude that sovereign immunity deprives this Court of jurisdiction to entertain Plaintiff's claims against Defendant in her official capacity.

---

[2]  The Tenth Circuit has not addressed "the extent to which the APA might supersede the principles announced in *Larson.*" *Wyoming*, 279 F.3d at 1235 n.20. Other circuits have, however, continued to apply the *Larson* framework in cases where the APA waiver of sovereign immunity is inapplicable. *See E. V. v. Robinson*, 906 F.3d 1082, 1093 (9th Cir. 2018) (collecting cases). And some courts have contemplated that the *Larson* and *Young* exceptions to immunity might, in appropriate circumstances, properly be applied in an official-capacity suit against a legislator or a member of the judicial branch. *See, e.g.*, *Attwood v. Clemons*, 818 F. App'x 863, 866-68 (11th Cir. 2020) (finding *Young* exception applied in suit against state representative who blocked constituent on Twitter and Facebook); *Dotson v. Griesa*, 398 F.3d 156, 177-79 (2d Cir. 2005) (finding *Larson* exception applied in suit against federal judges); *Danos v. Jones*, 652 F.3d 577, 581-84 (5th Cir. 2011) (assuming without deciding that APA does not abrogate *Larson*, and analyzing whether *Larson* exception applied in suit against federal judges); *Judicial Watch, Inc. v. Schiff*, 474 F. Supp. 3d 305, 310-16 (D.D.C. Sept. 15, 2022) (analyzing whether *Larson* exception applied in suit against U.S. representative); *Ward v. Thompson*, — F. Supp. 3d —, No. CV-22-08015-PCT-DJH, 2022 WL 4386788, at *4 to *8 (D. Ariz. Sept. 22, 2022) (same).

The lack of simplicity about sovereign immunity extends even to what sort of jurisdictional bar it is. *See* Caleb Nelson, *Sovereign Immunity as a Doctrine of Personal Jurisdiction*, 115 Harv. L. Rev. 1559, 1566 (2002) ("The Court has created a single doctrine of 'sovereign immunity' that reflects a strange cross between ideas of subject matter jurisdiction and ideas of personal jurisdiction."). Given this uncertainty, I proceed below to address another threshold flaw in Plaintiff's case.[3]

## B.  Cause of Action

Generally, federal courts may only exercise their powers when Congress has explicitly provided a cause of action. *See Collins v. Yellen*, 141 S. Ct. 1761, 1790 n.1 (2021) (Thomas, J., concurring) (the law must provide a judicially cognizable right to relief). Plaintiff points to no such explicit Congressional authorization for her claims, but again would have me rely on a broad, inherent equitable power to provide a remedy in this case. The Supreme Court has indeed inferred causes of action in somewhat related circumstances: *Ex parte Young*, 209 U.S. 123 (1908) and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Plaintiff is also right that a variety of older cases contain language supporting the proposition that there is always an implied private right of action to seek equitable relief for constitutional violations. *See, e.g.*, *Swann v. Charlotte-Mecklenburg Bd. of.*

---

[3]   Defendant also contends that Plaintiff lacks standing to bring her claims (Doc. 34 at 13-14), which, if true, would implicate the Court's subject-matter jurisdiction. But her "standing" arguments are actually merits arguments, as they are premised entirely on the proposition that Defendant's actions challenged here were private acts, not state action. *See Cath. League for Religious & Civ. Rights v. City & Cnty. of San Francisco*, 624 F.3d 1043, 1049 (9th Cir. 2010) ("[S]tanding analysis, which prevents a claim from being adjudicated for lack of jurisdiction, [cannot] be used to disguise merits analysis, which determines whether a claim is one for which relief can be granted if factually true.").

*Educ.*, 402 U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrong is broad, for breadth and flexibility are inherent in equitable remedies."); *Carlson v. Green*, 446 U.S. 14, 42-43 (1980) (Rehnquist, J., dissenting) ("The broad power of federal courts to grant equitable relief for constitutional violations has long been established.").

The Supreme Court has recently, however, in the context of suits for damages at least, flatly rejected reliance on that sort of broad language to infer causes of action where Congress has not done so. *See Egbert*, 142 S. Ct. at 1809. As the Court explained, "we have indicated that if we were called to decide *Bivens* today, we would decline to discover any implied causes of action in the Constitution." *Id.* And as Justice Gorsuch's concurrence continued,

> When might a court ever be 'better equipped' than the people's elected representatives to weigh the 'costs and benefits' of creating a cause of action? It seems to me that to ask the question is to answer it. To create a new cause of action is to assign new private rights and liabilities—a power that is in every meaningful sense an act of legislation.

*Id.* at 1809-10 (Gorsuch, J., concurring). Plaintiff's decision to drop her claims for monetary relief presumably reflects the reality that those claims could not survive this trend. *See also Silva v. United States*, 45 F.4th 1134, 1136 (10th Cir. 2022) ("The Supreme Court's message could not be clearer—lower courts expand *Bivens* claims at their own peril.").

Plaintiff is right, however, that the implied cause of action for equitable relief has not been called into question in the way *Bivens* actions for damages have. *Cf. Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) ("Given the notable change in the Court's approach to recognizing implied causes of action, however, the Court has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity. This is in

accord with the Court's observation that it has 'consistently refused to extend *Bivens* to any new context or new category of defendants.'"). But Plaintiff's somewhat cavalier reliance on *Ex Parte Young* and generic statements about courts' broad equitable powers is at least questionable. Most notably, all of the statements and precedents, at least as far as Plaintiff has pointed to or as far as I have found, involve enjoining *executive* action, not legislative. *See Armstrong*, 575 U.S. at 327; *Young*, 209 U.S. at 157; *Carlson*, 446 U.S. at 25; *Swann*, 402 U.S. at 6, 15. There simply is no precedent for enjoining a sitting member of Congress's official activity.[4]

And while it is true that some of *Egbert*'s considerations would not come into play in this context, some do. To the extent operating @laurenboebert is an official duty, as Plaintiff's claims contend, permitting judicial oversight of that activity could certainly lead to "harassing litigation [] unduly inhibit[ing] officials in the discharge of their duties." *Egbert*, 142 S. Ct. at 1807 (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). And other considerations not at play in *Egbert* are important here. Most notably, the prospect of a federal court ordering a member of the legislature to take certain actions in her official capacity raises serious separation-of-powers concerns. This is true of any implied cause of action, of course. *See Ziglar*, 137 S. Ct. at 1857 ("When a party seeks to assert an implied cause of action under the Constitution itself,

---

[4]   The closest may be *Davis v. Passman*, where a former Congressional staff member sued a congressman for sex discrimination in violation of the Fifth Amendment. 442 U.S. 228 (1979). The Court held there was a *Bivens* cause of action under the Fifth Amendment to sue the congressman for damages in his individual capacity. *Id.* at 246. *Egbert* has effectively limited *Davis* to its facts, 142 S. Ct. at 1809. And the *Davis* Court itself was careful to note that its holding did not reach the question of whether a court could enjoin the official conduct of a representative. *See* 442 U.S. at 246 n.24.

just as when a party seeks to assert an implied cause of action under a federal statute, separation-of-powers principles are or should be central to the analysis."). But such concerns may be especially acute in the context of a suit to enjoin an elected representative in light of the prospect of discovery and intrusion into official legislative actions, with no carefully delineated guardrails such as the APA or other rules governing suits against the executive.

The combination of Congressional silence in this area, the Supreme Court's admonition against inferring causes of action in new areas not supported by clear legislative instruction, and separation-of-powers concerns counsels caution about simply assuming a cause of action exists here. Ultimately though, because Plaintiff's claim is barred by sovereign immunity, as discussed above, and a lack of state action, as discussed below, I need not also decide whether there is an implied cause of action to sue members of Congress for injunctive relief.

## II.  State Action

The First Amendment acts as a restraint on government—not private—conduct. *Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 114 (1973). Plaintiff's current complaint effectively mirrors this requirement by only seeking relief against Defendant in her official—governmental—capacity. So the question is, did the action complained of here, blocking Plaintiff from @laurenboebert, constitute official or state action?

To demonstrate state action, Plaintiff must establish that Defendant's act in blocking her on the @laurenboebert Twitter account was

undertaken on behalf of the state. *West v. Atkins*, 487 U.S. 42, 49 (1988).[5] The question is whether Defendant exercised power "possessed by virtue of [federal] law" by blocking Plaintiff from this account, such that the blocking was "made possible only because [Defendant] is clothed with the authority of [federal] law." *Id.* A court may consider whether the action at issue "results from the [government]'s exercise of 'coercive power'" or with the government's "significant encouragement"; was caused by a private actor operating "as a willful participant in joint activity" with the government; is controlled by a government agency; or is "entwined" with governmental policies, management, or control. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295-96 (2001).

Defendant's conduct, blocking Plaintiff's Twitter account, does not implicate any of these considerations. Blocking a fellow citizen from the account at issue did not involve any "right or privilege created by the State." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999). Indeed, as I have already noted, "[t]he government does not authorize [Defendant] to run [the @laurenboebert] Twitter account, and her use of the account does not amount to action on the government's behalf." (Doc. 31 at 13.) Defendant blocked Plaintiff on Defendant's personal account

---

[5]   *West* and some of the other cases cited in this section were suits brought against state officials under 42 U.S.C. § 1983, and those cases address Section 1983's "under color of state law" requirement in connection with the state-action requirement of various constitutional provisions. 487 U.S. at 48-50. The "under color of state law" and "state action" requirements are similar and overlapping, though not always identical; state action necessarily constitutes action under color of state law, but the converse is not always true. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 928-35 & n.18 (1982). This, though, is not a case where the distinction makes a difference, because even if "under color of [federal] law" may in some circumstances cast a wider net than does the state action, Defendant's conduct here satisfies neither.

(@laurenboebert), not Defendant's official account (@RepBoebert). Defendant had authority to act on her personal account before taking office and will have that ability after leaving office. In contrast, Defendant did not have the power to block Plaintiff on the official account before taking office and will not have the ability to do so after leaving office.

Nor were Defendant's actions "made possible only because [she] is clothed with the authority of [federal] law." *West*, 487 U.S. at 49. Unlike Executive Branch officials, "[Defendant], or any member of Congress, has almost no power to act on behalf of the United States government." (*Id.* at 8-9 (quoting *West*, 487 U.S. at 49).) As previously discussed, the decisions in *Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019) and *Knight First Amendment Institute at Columbia University v. Trump*, 928 F.3d 226 (2nd Cir. 2019), have limited applicability here because they involve accounts of officials with executive functions, not of legislators, who have a much more limited ability to act on behalf of the state. (Doc. 31 at 10.) The scope and breadth of the powers granted to a legislator versus the president are fundamentally different, rendering a comparison here inapt. While, as discussed in my preliminary-injunction order, the president possesses quite expansive powers that can (and have been) exercised on Twitter, a member of Congress's powers are more limited and cannot be exercised in the same way on a platform like Twitter. (*See id.* at 9.)

The powers of a member of Congress do extend, though, beyond participating in debates, proposing legislation, and voting, and into obligations toward constituents. *See Williams v. United States*, 71 F.3d 502, 507 (5th Cir. 1995) ("Besides participating in debates and voting on the Congressional floor, a primary obligation of a Member of Congress in a representative democracy is to serve and respond to his or her constituents."). And Plaintiff attempts to justify her requests for discovery on

the ground that discovery will reveal Defendant uses the @laurenboebert account to connect with her constituents. (*See* Doc. 35 at 4.) But personal social-media pages may be used by members of Congress to interact with constituents and make statements pertaining to their elected position without automatically converting actions taken on those pages from private behavior into state action. *See, e.g.*, *Lindke v. Freed*, 37 F.4th 1199, 1205 (6th Cir. 2022) (holding that city manager's communications with residents on his personal Facebook page, even when they pertained to his office, were not sufficient to transform the use into state action, comparing such communications to an official's ability to "[visit] the hardware store, [chat] with neighbors, or [attend] church services" without the engagement constituting state action).

A somewhat analogous case to the one at hand is *Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158 (9th Cir. 2022). In *Garnier*, the Ninth Circuit, applying its own nexus analysis, held that two members of a school board engaged in state action when they blocked certain members of the public from their social-media pages after holding the pages out to be official channels of communication about the activities of the board.[6] *Id.* at 1169-73. The Ninth Circuit rejected the defendants' argument that

---

[6]   The law is not entirely settled on whether school-board members are completely analogous to legislators. The role of a school-board member often includes greater ministerial and administrative duties than that of a legislator. Courts may not treat school-board members as legislators in reference to the administrative and managerial activities undertaken in their official capacity. *See, e.g., Dobrich v. Walls*, 380 F. Supp. 2d 366, 375-77 (D. Del. 2005) (defining school-board members as local legislators and finding that school board members acted in the sphere of legislative activity when they promoted, endorsed, and established prayer at school-board events); *but see, e.g.*, *Ruder v. Pequea Valley Sch. Dist.*, 790 F. Supp. 2d 377, 401 (E.D. Pa. 2011) (finding that non-president members of school boards are not "high public officials" under state immunity doctrine).

social-media use cannot constitute state action because of the limited power of a legislator to act on behalf of the state. *Id*. at 1173. The court noted, however, that "not every social media account operated by a public official is a government account," and that courts should look to considerations such as "how the official describes and uses the account, to whom features of the account are made available, and how members of the public and government officials regard and treat the account" when evaluating the state-action question. *Id*. (quoting *Knight*, 928 F.3d at 236 (internal quotation marks omitted)).

While *Garnier* is more analogous to this case than *Davison* and *Knight*, it ultimately does not support a conclusion that Defendant's blocking Plaintiff from the @laurenboebert account constituted state action, even if there are genuine disputes of fact regarding whether Defendant uses official resources or staff to operate the @laurenboebert account. The defendants in *Garnier* blocked the plaintiff on the only public social-media accounts they operated, which they held out as their "official" accounts. *Id*. at 1163-64. And the defendants there utilized those accounts to announce hiring and firing decisions, alert the public about safety and security issues, and solicit input about policy decisions—all essential elements of their official positions. *Id*. at 1163-65, 1171, 1176. They posted almost exclusively about the performance of their official duties and official business and "virtually never posted overtly political or self-promotional material." *Id*. at 1172. The defendants' pages

> did not contain any disclaimer that the "statements made
> on this web site reflect the personal opinions of the author"
> and "are not made in any official capacity." To the contrary,
> both in the appearance and the content of the pages, the
> Trustees effectively "display[ed] a badge" to the public sig-
> nifying that their accounts reflected their official roles as

[school-board] Trustees, whether or not the District had in
fact authorized or supported them.

*Id.* at 1172 (citation omitted). It was essential to the court's state-action
finding that the defendants held their pages out to be "official channels
of communication with the public about the work of the [school] Board."
*Id.* at 1171.

Here, Defendant's @laurenboebert account does not hold itself out as
an official account. (*See* Doc. 1 at 7.) The homepage for the account, as
presented in Plaintiff's complaint, links to a campaign-fundraising page
for Defendant, and self-describes Defendant as "Congresswoman for
CO-03," "Owner of Shooter's Grill," and "the mom who told Beto HELL
NO." (*Id.*) In contrast, the homepage for Defendant's official @RepBoe-
bert account, from which Plaintiff is not blocked, links to Defendant's
official House website and self-describes Defendant exclusively in refer-
ence to her role in Congress—referring to her as "Congresswoman
(CO-03)," "Co-Chair #2A Caucus," and a member of several other House
committees and caucuses. (*See* Doc. 27-1.) Defendant's two Twitter ac-
counts are of different natures and uses—one (@laurenboebert) is held
out and operated as a personal and campaign account, while the other
(@RepBoebert) was established and is held out and used as an official
account—and these differences are readily ascertainable without discov-
ery. Indeed, on January 3, 2021—the day she was sworn into office—
Defendant tweeted from @laurenboebert: "If you want to follow my Con-
gressional account, where important district info & official Congres-
sional business will be posted, join me over at @RepBoebert. This ac-
count will remain my personal account!". Lauren Boebert (@laurenboe-
bert), Twitter (Jan. 3, 2021, 8:52 AM), https://twitter.com/laurenboe
bert/status/1345729805023588353. Defendant's use of her personal
Twitter account does not reach the requisite threshold to convert the

account into one by which state action is taken. *Cf. Campbell v. Reisch*, 986 F.3d 822 (8th Cir. 2021) (campaign-related substance of tweets was insufficient to transform private social-media account into official account).

Plaintiff suggests that the possible use of "any official resources" to post on the @laurenboebert account, "whether that be her official cell phone, computer, or otherwise," could transform actions taken from her personal account into state action. (*See* Doc. 35-1 ¶¶ 7, 10.) But such factors are not dispositive. *See Lindke*, 37 F.4th at 1205 (holding that "de minimis" assistance by staff in running a personal social media page is "not enough to render the page state action"). "[A] public official's use of a particular phone to take various official actions would not be determinative of whether every action taken on that phone amounted to state action." (Doc. 31 at 8.) Likewise, the fact that Defendant may "post[] on the @laurenboebert account while conducting official duties" (Doc. 35-1 ¶ 10) is not determinative; an official may take various actions throughout the course of a work day (*e.g.*, pausing to text a friend or family member or read a personal email) that, though done "while conducting official duties," are not official actions. Plaintiff's requests for discovery are denied as discussed further below. The discovery that Plaintiff seeks, even if such evidence exists, would be insufficient to overcome the other considerations—namely, the publicly ascertainable differences between how Defendant holds out and uses her personal and official Twitter accounts—that weigh heavily in favor of my finding that Defendant's action in blocking Plaintiff from @laurenboebert was not state action.

## III. Plaintiff's Requests for Discovery Pursuant to Rule 56(d)

Federal Rule of Civil Procedure 56(d) allows a court to deny or defer ruling on a motion for summary judgment if the "nonmovant shows by

affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." But Rule 56(d) "is not a license for a fishing expedition." *Lewis v. Ft. Collins*, 903 F.2d 752, 758 (10th Cir. 1990). The "mere assertion that discovery is incomplete or that specific facts necessary to oppose summary judgment are unavailable" is insufficient to invoke Rule 56(d) relief. *Pasternak v. Lear Petroleum Expl., Inc.*, 790 F.2d 828, 833 (10th Cir. 1986). "To resist summary judgment on this basis, a party must specifically identify what facts it seeks to discover and show how those facts would materially aid its case on the dispositive issues." *Chavez v. Perry*, 142 F. App'x 325, 334 (10th Cir. 2005). Denial of a Rule 56(d) request is proper if the evidence sought would not demonstrate a genuine issue of material fact to defeat summary judgment. *Blixseth v. Cushman Suisse AG*, 129 F. Supp. 3d 1190, 1211 (D. Colo. 2015).

Plaintiff's counsel's declaration lists the following items "it is necessary to explore through discovery":

1. How Defendant uses the @laurenboebert account;

2. Where and when Defendant posts to the @laurenboebert account;

3. Whether any official resources are used in the operation of the @laurenboebert account;

4. Who posts to the @laurenboebert account;

5. What content Defendant posts to the @laurenboebert account;

6. Who Representative Boebert intends to connect with through her use of the @laurenboebert account;

7. Why Representative Boebert blocked Ms. Buentello from the @laurenboebert account; and

8. Whether Representative Boebert was acting in her official capacity in blocking Ms. Buentello and in the operation of the @laurenboebert account.

(Doc. 35-1 ¶ 8.) For a variety of reasons, these discovery requests do not justify postponing ruling on or denying the pending motion for summary judgment.

First, discovery requests 1 and 5—how Defendant uses the @laurenboebert account and what content Defendant posts to the account—both seek information that could have already been obtained by Plaintiff without discovery. Plaintiff has had ample time to view Defendant's public Twitter account, and she fails to specify reasons why she cannot present facts regarding how Defendant uses the account and what content Defendant posts to it. Fed. R. Civ. P. 56(d); *see also FDIC v. Arciero*, 741 F.3d 1111, 1116 (10th Cir. 2013) (party requesting Rule 56(d) discovery must identify "the probable facts not available and what steps have been taken to obtain these facts"). Second, discovery request 8, in which Plaintiff seeks to determine whether Defendant was acting in her official capacity in blocking Plaintiff and in the operation of the @laurenboebert account, is a legal conclusion, not a potential fact. Third, discovery request 7, which is aimed at Defendant's reason for blocking Plaintiff, seems at most tangentially relevant to the legal issues presented in the summary-judgment motion (which is not premised on Defendant's motivations); this evidence could be relevant to the substance of Plaintiff's First Amendment retaliation claim, but it will not aid in

determining the state-action question at issue.[7] *See Chavez*, 142 F. App'x at 334 (Rule 56(d) relief not warranted if information sought is irrelevant to summary-judgment motion); *Ganley v. Jojola*, 402 F. Supp. 3d 1021, 1055 (D.N.M. 2019) ("The Court has previously denied rule 56(d) motions where the information sought does not relate to a relevant legal question.").

The remaining evidence sought by Plaintiff—requests 2, 3, 4, and 6—is potentially relevant to the state-action question at issue here, as other circuits have pointed out in recent opinions. *See Garnier*, 41 F.4th 1158; *Knight*, 928 F.3d 226. But these requests lack specificity and appear to be no more than a fishing expedition—Plaintiff seeks simply to "explore" these areas of inquiry through discovery, and her counsel makes broad, unsupported assertions as to what he "believes" discovery will reveal. (Doc. 35-1 ¶¶ 8, 10.) Such "vague, general statements of what [Plaintiff] hope[s] to discover are a far cry from the 'facts essential to justify [her] opposition' required by [Rule] 56(d)." *Trans-Western Petroleum, Inc. v. U.S. Gypsum Co.*, 830 F.3d 1171, 1176 (10th Cir. 2016); *see also Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1206-07 (10th Cir. 2015) (affirming denial of Rule 56(d) request where affidavit "only raised a speculative hope of unearthing evidence sufficient to prevail at summary judgment"); *Arciero*, 741 F.3d at 1116 ("Speculation cannot support a Rule 56(d) motion.").

---

[7]   Plaintiff contends that this request is pertinent to Defendant's Supremacy Clause arguments (Doc. 38 at 8-9), but because I find a lack of state action and grant summary judgment as to Plaintiff's federal claims, I will decline to exercise supplemental jurisdiction over Plaintiff's state-law claim to which Defendant's Supremacy Clause arguments apply. *See* 28 U.S.C. § 1367(c)(3).

Plaintiff seeks to test the veracity of the sworn declarations that Defendant and her chief of staff provided. (Doc. 35-1 ¶¶ 5, 7-8.) Those declarations state that Defendant does not use Congressional staff or official resources to operate the @laurenboebert account. (Docs. 27-1, 27-2.) But other than noting that the declarations are "self-serving," Plaintiff has provided no reason to question the veracity of the declarations; simply asserting that they may be untrue is inadequate. *See Ellis*, 779 F.3d at 1206 ("We expect Rule 56(d) motions to be robust . . . ."); *Strang v. U.S. Arms Control & Disarmament Agency*, 864 F.2d 859, 861 (D.C. Cir. 1989) ("Without some reason to question the veracity of affiants . . . [plaintiff]'s desire to 'test and elaborate' affiants' testimony falls short; her plea is too vague to require the district court to defer or deny dispositive action."); *Citizens for Responsibility & Ethics in Wash. v. Leavitt*, 577 F. Supp. 2d 427, 434 (D.D.C. 2008) (when a "plaintiff offers no reason to doubt [declarant]'s veracity, discovery under Rule 56[(d)] may not be used to test her credibility.").

My impression that Plaintiff's discovery requests are a fishing expedition is heightened by the type of discovery sought—in addition to unspecified "written discovery," Plaintiff seeks to depose a member of Congress and a member of her staff, and to take a Rule 30(b)(6) deposition "of the Congresswoman's office." (Doc. 35-1 ¶ 7.) "[T]he settled rule across the circuits is that absent extraordinary circumstances, high-ranking officials may not be subjected to depositions or called to testify regarding their official actions." *Coleman v. Schwarzenegger*, Nos. CIV S-90-0520 LKK JFM P, C01-1351 TEH, 2008 WL 4300437, at *2 (N.D. Cal. Sept. 15, 2008); *see also Wuterich v. Murtha*, 562 F.3d 375, 386-87 (D.C. Cir. 2009) (disallowing discovery of congressman's official information as "nothing more than a fishing expedition for

- 23 -

facts that *might* give rise to a viable . . . claim" and noting it is generally error to authorize depositions of high-ranking officials).

And finally, as discussed above, even assuming that discovery showed Defendant was using official resources to manage the @laurenboebert account or directing staff members to block certain constituents from that account, the outcome in this case would still be the same.

## CONCLUSION

Justice Brandeis famously admonished that

> To courageous, self-reliant men, with confidence in the power of free and fearless reasoning applied through the processes of popular government, no danger flowing from speech can be deemed clear and present, unless the incidence of the evil apprehended is so imminent that it may befall before there is opportunity for full discussion.

*Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring). In this view, the best response to speech one disagrees with, or even finds dangerous, is "to avert the evil by the processes of education[;] the remedy to be applied is more speech, not enforced silence." *Id*. Twitter, in theory, could have been just the place for such courageous men and women, confident in their free and fearless reasoning, to put this democratic paradigm to the test. Instead, most involved on the platform seem to want to use it to reinforce ideas already held and will fight to insulate themselves and those they agree with from criticism and contrary or uncomfortable—let alone "dangerous"—speech. Because the federal courts' reach into such questions is precluded in this case, however, whether such users are right, or Justice Brandeis was, will have to be resolved elsewhere.

It is ORDERED that:

Defendant's motion for summary judgment (Doc. 34) is GRANTED;

Plaintiff's First Amendment claims (Doc. 1 ¶¶ 59-83) are DISMISSED WITH PREJUDICE; and

I decline to exercise supplemental jurisdiction over Plaintiff's claim under the Colorado Constitution (Doc. 1 ¶¶ 84-93), and that claim is DISMISSED WITHOUT PREJUDICE.[8]

DATED: October 28, 2022                    BY THE COURT:

                                           Daniel D. Domenico
                                           United States District Judge

---

[8] *See* 28 U.S.C. § 1367(c)(3); *Bauchman ex rel. Bauchman v. W. High Sch.*, 132 F.3d 542, 549 (10th Cir. 1997) (if federal claims are dismissed before trial leaving only issues of state law, federal court should decline exercise of jurisdiction over state-law claims and dismiss them without prejudice).